**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar MANCILLAS and Charles Lowry,
Defendants-Appellants.**

**Nos. 77–1503, 77–1507.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1978.

Decided July 25, 1978.

1302

Rhoda L. Elvove and Michael J. Guinan,
Chicago, Ill., for defendants-appellants.

Anne B. Poulin, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and TONE, Circuit Judges, and EAST, Senior District Judge.*

PELL, Circuit Judge.

Defendants-appellants Oscar Mancillas and Charles Lowry were convicted by a jury of conspiring to distribute and to possess with intent to distribute heroin, in violation of 21 U.S.C. § 846, and of possessing slightly less than a kilogram of heroin with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Claudio A. Davalos and Saul Aveytia were indicted codefendants on the conspiracy and possession counts, and were charged in a separate count with possessing in excess of four kilograms of heroin with intent to distribute it. Aveytia, who was a fugitive from justice, was not tried. Davalos was tried with Mancillas and Lowry and was acquitted of all charges.

On appeal, Mancillas and Lowry contend that their motion to suppress heroin seized at the time of their arrest should have been granted, that the evidence was insufficient to sustain the charges against them, and that certain hearsay testimony was erroneously admitted at trial to their prejudice.

## I.

Appellants argue that their warrantless arrest was illegal, having been made without probable cause, and that the heroin secured as an incident thereof should have been suppressed. See *Whitely v. Warden*, 401 U.S. 560, 568–69, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Alternatively they argue that even if the arrest was legal, seizure and search of the kilogram package of heroin without a warrant was not, and the evidence should have been suppressed for that reason.

The facts leading up to the arrest were these. On July 13, 1976, one Jose Rodriguez and an alleged confederate were arrested and charged with possession of heroin. The heroin was contained in a plastic bag completely wrapped up in beige masking tape, forming an oval shaped package about six inches long. Rodriguez, who had previously been observed by Drug Enforcement Administration (DEA) and Chicago Police operatives as associating with Mancillas, gave agents a statement indicating that the package just described had come from Mancillas, and that he (Rodriguez) had on at least one occasion delivered a shipment of heroin for Mancillas.

Rodriguez then gave the tip which led to the instant arrests. He told the agents that Mancillas was then in Cleveland, Ohio; that Mancillas would either return directly to Chicago or would fly to El Paso, Texas; that the El Paso trip, if made, would be for the purpose of making partial advance payment on a delivery of heroin; that Mancillas would return from El Paso to Chicago and remain in the Chicago area for eight to ten hours and would then proceed with another individual to an unnamed motel in Joliet, Illinois, to receive the heroin; that the heroin would be brought to Chicago by a red and white camper truck or some other vehicle, bearing Texas license plates.

DEA agents immediately began to investigate Rodriguez's tip. An agent in Cleveland located Mancillas at a motel, from which he checked out on July 13 to proceed to the Cleveland airport. His only luggage, a briefcase, was routinely fluoroscoped there, and revealed a mass of paper or wood with outline dimensions of 2½″ by 6″ (the size of United States currency). Mancillas flew to El Paso, where he was observed meeting with Aveytia. On July 17, Mancillas returned to Chicago, where he was met at about 7:30 p. m. by Lowry in the latter's Buick automobile.

As the Buick left the airport terminal area, Mancillas was observed leaning out the passenger window to look at the traffic behind the car. Mancillas and Lowry then drove to three motels, at the third of which, in Lyons, Illinois, Mancillas registered under an assumed name, in Lowry's presence. At about 9:00 p. m., Mancillas and Lowry

* Senior Judge William G. East of the District of Oregon is sitting by designation.

left the motel and drove to Chicago, where Mancillas dropped Lowry, keeping the car. Around midnight, Mancillas returned to the motel with an unidentified woman. The two left the motel at 4:00 a. m., and drove to Chicago, where the woman left the car. Mancillas ate breakfast, had a short meeting on a street corner, with an unidentified man, and returned to Lowry's residence at 5:15 a. m. He honked the horn in the alley behind the residence, and Lowry promptly came out. Lowry drove the two to the Holiday Inn West in Joliet. They arrived slightly after 6:00 a. m.

Meanwhile DEA and Chicago Police agents had set up surveillance at numerous Joliet area motels. At 4:15 a. m., Aveytia and Davalos, driving a brown Ford automobile with Texas license plates, were observed checking into the Holiday Inn West. They proceeded to room 208 there, Aveytia carrying an oval shaped package wrapped entirely in beige masking tape.

When Mancillas and Lowry reached the motel, Mancillas went to the lobby, asked for Aveytia, and used the house telephone. Both appellants then went to room 208. Shortly thereafter, the law enforcement agents approached the room. As they did so, the door was opened from the inside by Mancillas, who looked out quickly, and attempted to close the door. The agents announced their office and identity, entered the room forcibly,[1] seized the tape-wrapped package (which contained slightly less than a kilogram of heroin), and arrested Mancillas, Lowry, Aveytia, and Davalos. A subsequent search of Aveytia's car revealed more than four additional kilograms of heroin, also wrapped in taped packages.

■ The legality of the arrest here depends on whether probable cause existed therefor. Probable cause exists where the facts and reasonably trustworthy information known to the arresting officers, are " 'sufficient in themselves to warrant a man

of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959), quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The standard, however, is "only the probability, and not a prima facie showing, of criminal activity . . . ." *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).[2] We are quite satisfied that this standard was met here.

■ Probable cause may be based solely on the tip of an informer, if adequate indications exist that the informer is reliable or credible, and the basis for his conclusion is known. *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. 584. Here the informer's tip included an admission that he had performed a criminal act for Mancillas previously. This declaration against penal interest imparted some credibility, even if some sort of cooperation agreement with the authorities was in process. *United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Moreover, we note that if Rodriguez, who was under arrest at the time of his statement, hoped to curry favor with the authorities thereby, a fabrication that precipitated a major three-state investigation for naught would hardly be a sensible way to go about it. Rodriquez's tip, then, bore at least some indications of reliability notwithstanding his lack of a "track record" as an informer. The latter is "but one way" of buttressing credibility. *See United States v. Squella-Avendano,* 447 F.2d 575, 582 (5th Cir. 1971), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369.

Although the precise basis for Rodriguez's tip was not articulated, an ample basis for giving it some credit existed. In *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. 584,

---

1. The door, however did not need to be broken, so 18 U.S.C. § 3109 and *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), are in no way involved.

2. *Spinelli,* of course, involved probable cause to issue a search warrant. As the Court pointed out, however, the analysis required is "basically similar" in either context. 393 U.S. at 417 n. 5, 89 S.Ct. 584.

the Court emphasized that the informer used there had never seen the defendant committing criminal acts or engaged in criminal activity with him.[3] Here, of course, both independent law enforcement activity and the statement of Rodriguez itself linked him with Mancillas in what the statement indicated was the very type of criminal activity being investigated. *See United States v. Stallings,* 413 F.2d 200, 204 (7th Cir. 1969), *cert. denied,* 396 U.S. 972, 90 S.Ct. 460, 24 L.Ed.2d 440. Furthermore, Rodriguez's tip reflected sufficient detail to indicate more than "a casual rumor circulating in the underworld or an accusation based merely on [Mancillas'] general reputation." *Spinelli, supra,* 393 U.S. at 417, 89 S.Ct. at 589. In this sense, it was self-verifying, because the details of criminal plans of such magnitude as were involved here are not generally obtainable "from an offhand remark heard at a neighborhood bar," *id.,* for example.[4]

Rodriguez's tip, then, created at least solid grounds for suspicion. By the time of the arrest, it surely had ripened into probable cause. Each element of Rodriguez's prediction had been corroborated by independent law enforcement investigation,[5] in the manner we have detailed above. *See Draper v. United States, supra.* In addition, Mancillas' apparent attempt to detect surveillance as he and Lowry left O'Hare Airport, the visits to three motels by the two, and the fact that Mancillas' registra-

tion in the third motel was under a false name, all constituted independent suspicious activity. *See United States v. Squella-Avendano, supra,* 447 F.2d at 583.

■ Appellants insist that if probable cause ever ripened here, it ripened by 4:15 a. m., when Aveytia and Davalos checked into the Holiday Inn West and Aveytia was observed carrying the tape-wrapped package. Accordingly, it is said, the agents had to arrest Aveytia and Davalos on the spot or else procure a warrant to search and/or arrest.[6] We disagree. First, "the agents were not 'obliged to intercept incipient criminality before the participation of others therein [could] be ascertained.' " *United States v. Issod,* 508 F.2d 990, 993 (7th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975) (citation omitted). Second, and perhaps more important, it may well be doubted that probable cause to search or arrest at the Holiday Inn could have been established prior to the arrival of Mancillas and Lowry. Rodriguez's description of Aveytia (whom he did not name), while accurate, was hardly sufficient to distinguish him from many other Mexican males of his general size and age. That his car bore Texas license plates surely was not in itself suspicious enough to generate probable cause, nor was the presence of a tape-wrapped package, until a sufficient nexus to Mancillas could be established. As the district court noted, appel-

3. More precisely, the affidavit put before a magistrate to justify a search warrant there contained no allegations that the informer had seen or participated in such conduct.

4. Despite appellants' protestations to the contrary, we think the detail in Rodriguez's tip compared quite favorably to that reflected in the tip involved in *Draper v. United States, supra,* cited as an example of probative detail in *Spinelli.* The tip in *Draper* involved nothing more than a physical description of the defendant and of the gait at which he customarily walked, the conclusion that the defendant was dealing in narcotics, the statement that defendant would return from Chicago with a supply of heroin on one of two specified days by one of numerous trains on those days, and a description of clothing he would be wearing and a tan bag he would be carrying.

5. The only apparent discrepancy between Rodriguez's statement and the facts as observed by the agents was that Aveytia and Davalos arrived in Joliet in a brown Ford rather than a red and white camper truck. But, as reflected in the testimony on the motion to suppress, the tip as to the red and white truck was stated only as a possibility, the possibility that another vehicle would be used also having been mentioned.

6. We note that appellants are suggesting here that it would have been quickly possible in the early morning hours of this Sunday to have obtained a hearing before a magistrate. Although counsel for appellants assert that there must be 24-hour magistrates available for Joliet, just as there apparently are in Chicago, there is nothing in the record before us to support the assertion.

lants' arrival established that nexus, and the last piece of the puzzle thus fell into place.

> [W]ith every other bit of [Rodriguez's] information being thus personally verified, [the agents] had "reasonable grounds" to believe that the remaining unverified bit of [his] information—[that a heroin sale was about to occur]—was likewise true.

*Draper, supra,* 358 U.S. at 313,[7] 79 S.Ct. at 333.

At that point, with every reason to believe that these highly mobile individuals were in the process of consummating a transfer of heroin, and no reason to believe they would choose to linger while an arrest and search warrant was obtained, the agents were perfectly justified in effecting an arrest without a warrant. *See United States v. Conner,* 478 F.2d 1320, 1323–24 (7th Cir. 1973); *United States v. Polesti,* 489 F.2d 822 (7th Cir. 1973), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975).

■ The question remains whether the warrantless seizure and search of the tape-wrapped package fall within one of the exceptions to the general rule that warrantless searches are reasonable under the Fourth Amendment. Neither the Government nor the appellants have offered us much help in deciding this question. The thrust of appellants' argument is that the time between Aveytia's and Davalos' arrival at the motel and the arrests would have allowed procuring a warrant, which argument we have just rejected. The Government's response, on the other hand, fails apparently to recognize that a legal arrest does not necessarily justify a resulting search.

We believe, nonetheless, that the legal arrest in the circumstances of this case did justify the search and seizure of the heroin package. When Mancillas opened the door to room 208, a police officer observed the package on a chair next to the door, which package he seized immediately upon entry, and which a DEA agent opened to perform a field test on its contents soon after the arrests were effected. At that time, the agents had ample reason to believe the package contained contraband which was readily destructible. Mancillas' proximity to the door, and thus to the package, in addition to the fact that there were three other men in the single motel room with at least reasonably direct access to the package, brings this case within the exception to the warrant requirement for searches incident to a lawful arrest.[8] *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In such circumstances, *Chimel* recognized that

> [t]here is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Id.* at 763, 89 S.Ct. at 2040.

■ Although appellants did not press the point, we recognize that under *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), a warrantless seizure incident to arrest to protect evidence does not necessarily justify a subsequent warrantless search of the contents of the object seized, once it is safely within the control of the authorities. The incident in question here, however, occurred before *Chadwick.* In *United States v. Berry,* 571 F.2d 2 (7th Cir. 1978), this court declined to

---

7. As we note *infra,* law enforcement agents learned at about 5:00 a. m. that Aveytia had placed a telephone call to Mancillas' residence soon after his arrival at the motel. This call established some connection between the two men, even if it were not completed (Mancillas did not go to his residence that night, but could have telephoned his residence for messages), but significant elements of the detail which imparted reliability to the Rodriguez tip—that

Mancillas would drive to Joliet with another person, after staying in Chicago eight to ten hours, in order to meet with Aveytia and receive heroin—had not yet come true.

8. We deem it immaterial, in light of the exigencies of the situation, that the actual seizure of the package occurred just before the effectuation of the arrests. *See United States v. Squella-Avendano, supra,* 447 F.2d at 583.

apply *Chadwick* retroactively, because prior to *Chadwick,* law enforcement officials had no reason to doubt that they could subsequently search without a warrant objects legitimately seized pursuant to an arrest, even after the arrest was fully completed. We adhere to that position.

## II.

■ Both appellants assert the insufficiency of the evidence to support their conspiracy convictions. Assessing the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), these arguments are without merit.[9]

■ The thrust of Mancillas' argument is that the evidence discloses only a relationship of buyer and seller between himself and Aveytia. Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction.

> The relationship of buyer and seller *absent any prior or contemporaneous understanding beyond the mere sales agreement* does not prove a conspiracy to sell, receive, barter or dispose of stolen property although both parties know of the stolen character of the goods. In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective.

*United States v. Ford,* 324 F.2d 950, 952 (7th Cir. 1963) (emphasis added); *accord, United States v. Braico,* 422 F.2d 543 (7th Cir. 1970), *cert. denied,* 398 U.S. 912, 90 S.Ct. 1712, 26 L.Ed.2d 74; *United States v. Varelli,* 407 F.2d 735, 748 (7th Cir. 1969), *cert. denied sub nom. Saletko v. United States,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). But in each of these cases, on which appellant relies, a single transient sales agreement was all that was established.

There is more here. The Government offered evidence from which the jury could properly have found that several phone calls were made by Mancillas to Aveytia prior to the incidents in Chicago, that Mancillas went to El Paso and met with Aveytia, that Mancillas and Aveytia had in fact checked into the Holiday Inn West motel together on July 2, 1976, that on Aveytia's arrival on July 18 he promptly telephoned Mancillas' residence, and that soon thereafter Mancillas joined Aveytia at the motel to effect distribution. From all of these facts, the jury could reasonably have concluded that Mancillas and Aveytia had an ongoing relationship in the distribution of heroin, or that at least they had prearranged the interstate transportation of heroin for distribution in Chicago, or both. Either conclusion would support a determination that there was a prior understanding with a common purpose.

Lowry adopts Mancillas' buyer-seller argument, but our (and the jury's) rejection of it means that it was only necessary for the Government to prove and the jury to find that Lowry in some knowing way participated in the Mancillas-Aveytia conspiracy. *United States v. Hickey,* 360 F.2d 127, 138 (7th Cir. 1966), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210. Although the case made out by the Government was not overwhelming, we believe the jury properly could have so found. Counsel for Lowry suggests a series of "innocent explanation" arguments: perhaps Lowry only met Mancillas at O'Hare because he was his brother-in-law; perhaps Lowry, concentrating on driving, did not see Mancillas' apparent attempt to detect surveillance, or, if he did, attributed the action to mere interest of Mancillas in traffic patterns; perhaps Lowry thought Mancillas registered in his motel under a false name to avoid detection of his apparently amorous rendezvous there later that night; perhaps Lowry lent Mancillas his car that night only as a friendly gesture. Noting that the jury was not obliged to accept this gloss on what Lowry saw and did that night, nor must we, *Glasser, supra,* we can agree with counsel for the Government that if Lowry had done no more and had slept in, *e. g.,* on the morning

---

9. No suggestion is made that the jury was not properly instructed.

of Sunday, July 18, his conviction could not stand.

■ But there is nothing improper about a jury's basing a conspiracy conviction on circumstantial evidence, and Lowry's actions that Sunday provided sufficient evidence of that type. When Mancillas pulled into the alley behind Lowry's home at 5:15 a. m., honking the horn of the car, Lowry, obviously by prearrangement, came right out and got in the car. The two proceeded directly to the Joliet motel. The jury could properly have concluded there was no reason for Lowry's presence in the car or the motel room unless he was a part of the deal. Mancillas, after all, already had the use of the car, and had no apparent need of Lowry to use it to go to Joliet. That Lowry would have desired and been invited to make the lengthy drive just for the pleasure thereof early on a Sunday morning, or that his presence in room 208 where all the evidence clearly indicated an illicit transaction was to occur was explainable innocently, must have struck the jury, as it strikes us, as being totally inconsistent with the teachings of common sense.

■ It is true enough, as appellants argue, that mere presence at the scene of the crime or mere association with conspirators will not by themselves support a conspiracy conviction. *See Bailey v. United States,* 135 U.S.App.D.C. 95, 97–99, 416 F.2d 1110, 1112–14 (1969), and cases cited; *United States v. Quintana,* 508 F.2d 867, 879–81 (7th Cir. 1975); *United States v. Baker,* 499 F.2d 845, 847–49 (7th Cir. 1974), *cert. denied,* 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667. *Bailey* and *Baker,* however, expressly point out that presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy. This case is different from *Bailey, Quinta-*

*na,* and *Baker* because the suspicious events of July 17 allowed the jury to find Lowry knew what was to occur in Joliet, and the particular circumstances of Lowry's involvement on July 18 made it highly unlikely his presence was innocently explainable.[10]

Moreover, it is quite plain in this case that the jury did not convict Lowry just because he drove a car and was present in room 208. Davalos helped Aveytia with the driving from Texas, and was also present in room 208, yet he was acquitted of all charges. Obviously the jury concluded upon proper instructions that Davalos' presence could within a reasonable doubt be innocently explained, as to reach Chicago in time Aveytia needed a driving helper, and once in room 208, there was no place else for Davalos to be. The evidence also indicated he had been sleeping prior to appellants' arrival. The jury's careful discrimination between Lowry and Davalos buttresses our conclusion that the differing circumstances of Lowry's involvement justified sending the case to the jury and supported its verdict.

### III.

Appellants suggest that their convictions for possessing the kilogram heroin package cannot stand because neither of them was ever seen holding the package and the motel room in which it was found was not their room. The Government concedes that only constructive possession could be found here, but argues that the circumstantial evidence before the jury allowed it to conclude that appellants had the intention and were in a position to exercise dominion and control over the package, which suffices to establish constructive possession.

■ Such a conclusion would justify conviction for possession. *See United*

10. In *Bailey,* the defendant was present on a *public street,* where he had been playing "craps" with the robber and others prior to the robbery, when the robbery occurred. In *Quintana,* the defendant was a conspirator's godson, and was present in the latter's store while conspiracy business was discussed, although there was *no evidence he even heard the conversations,* let alone that he did anything at all to advance the conspiracy's ends. In *Baker,* the

defendant was apparently present at the *lodgings he shared with a conspirator* while drug business was discussed, and drove his roommate to the scene of the distribution, *accompanied by another person who was not a part of the conspiracy,* and Government agents *affirmatively testified* that the defendant *never played any part in drug discussions or transactions.*

*States v. DiNovo,* 523 F.2d 197, 201 (7th Cir. 1975), *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387; *United States v. Holland,* 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971). We agree with the Government that the conclusion could reasonably have been drawn by the trier of fact here. The evidence brought forward, although circumstantial, rather clearly indicated that appellants were present in room 208 for the very purpose, concurred in by Aveytia, of taking possession of the heroin. The cases relied on by appellants do not support their position. In each one,[11] mere presence in the vicinity of contraband or association with its possessor *absent any basis for inference of intention and ability to exercise dominion or control* was involved.

IV.

Over appellants' objection, a DEA agent was permitted briefly to testify that he had received a tip from Rodriguez that Mancillas was then in Cleveland, would by flying to El Paso, would return to Chicago for eight to ten hours, and would then go to a motel in Joliet "to receive a shipment of heroin." The district court gave no limiting instruction with reference to this testimony (none having been requested) and appellants urge us to find reversible error in its admission.

Appellants primarily object to allowing the agent to testify that Rodriguez said the trip to Joliet was for the purpose of receiving a heroin shipment. This statement, they insist, was the only direct evidence of that purpose, and was prejudicial hearsay. The district court took the view that the evidence would be useful to establish the pertinent background, *i. e.,* to explain how the extensive law enforcement activity soon to be spread out in the record came to be.

■ Under Rule 801(c), Fed.R.Evid., an out-of-court statement is not defined as hearsay unless it is offered "to prove the truth of the matter asserted." A statement

that is relevant, *see* Rule 401, merely because it was made, and that is not unduly prejudicial, *see* Rule 403, may be admitted even though the declarant cannot be cross-examined. Whether or not the Rodriguez statement was true, the fact that it was made would surely explain the flurry of investigative activity in three states that the jury was soon to hear about. *See United States v. Herrera,* 455 F.2d 157 (5th Cir. 1972); McCormick's Handbook of the Law of Evidence § 248 at 587 (2d ed. 1972). For this purpose, outlining the background of the investigation, with the evidence not being offered to prove its truth, it could be said not to be nonadmissible as hearsay.

In *United States v. Gomez,* 529 F.2d 412, 416–17 (5th Cir. 1976), and *United States v. Rodriguez,* 524 F.2d 485 (5th Cir. 1975) (per curiam), *cert. denied,* 424 U.S. 972, 96 S.Ct. 1474, 47 L.Ed.2d 741, however, the Fifth Circuit has held that such background tips should be excluded if they contain out-of-court statements that point directly to the defendant with a charge of crime. *Accord,* McCormick, *supra,* § 248 at 587. Although these authorities purport to exclude such evidence *as hearsay,* the rationale given for exclusion is that a definite charge in a tip will be credited by the jury as evidence of the fact asserted despite proper limiting instructions [12] and a proper purpose for the evidence not dependent on the truth of the matter asserted.

We believe *Gomez* and *Rodriguez* make an important point, although we make it somewhat differently. Even if a tip with a direct charge of specific criminality cannot practically be *received* in evidence only to prove something other than its truth, it can be nevertheless *offered* for that purpose, and it is by the offer that Rule 801(c) defines hearsay. Thus viewed, the question is one of relevance and prejudice, not of hearsay.

Rule 401 defines relevant evidence as that which has any tendency to make the existence of any fact that is of conse-

---

11. *United States v. DiNovo, supra; United States v. Watkins,* 171 U.S.App.D.C. 158, 519 F.2d 294 (1975); *United States v. Ferg,* 504 F.2d 914 (5th Cir. 1974); *United States v. Stephenson,* 474 F.2d 1353 (5th Cir. 1973); *United*

States v. Holland, supra; Arellanes v. United States, 302 F.2d 603 (9th Cir. 1962).

12. Plainly adequate limiting instructions were given both in *Gomez* and in *Rodriguez.*

quence to the determination of the action more probable or less probable than it would be without the evidence.

Viewed in the limited light necessary for admission despite the barrier of the hearsay rule, the tip evidence here would appear to make probable only one fact: that the law enforcement agents had a reason to be where they were at the pertinent times. But there was no suggestion here of any improper law enforcement purposes, and in any event the agents' reasons for investigation were most assuredly not something the Government had to prove to carry its burden. The fact proved, then, is of only minimal "consequence to the determination of the action." The Government, in fact, conceded as much on oral argument here. Pressed to explain why the Government needed this evidence, Government counsel candidly admitted that it had probably been poor judgment to offer it.

To give the jury a sense of the context of the activities to be described may provide some incidental benefit in the present situation, but we think any such value ordinarily

> is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

Fed.R.Evid. 403. *See Gomez, supra,* 529 F.2d at 417. To allow testimonial repetition of a declarant's out-of-court charge that the defendant would engage or was engaged in specific criminality would seem to create too great a risk that these dangers will actualize.[13] That risk cannot be justified simply to set forth the background of the investigation.

■ Having determined that the DEA agent's hearsay evidence about the purpose of Mancillas' predicted trip to Joliet should not have been admitted, we must decide whether reversal for a new trial is required. In doing so, we place no weight on the failure of the district court to instruct the jury on the limited proper use of the evidence. In the extensive sidebar that preceded the introduction of the evidence, defense counsel never asked for a limiting

instruction, and even on appeal they insist that an instruction would have damagingly highlighted the evidence. The district court was plainly aware of the limited role of the evidence, and we see no reason to assume that an appropriate instruction would have been refused if demanded. At the very least, we decline to allow this tactical choice to increase appellants' chances for reversal on appeal. *See United States v. Krohn,* 560 F.2d 293, 297 (7th Cir. 1977), *cert. denied,* 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182 (1977); *cf.* Fed.R. Crim.P. 30.

The narrow question, then, is whether the danger that the jury would take the hearsay statement of Rodriguez as proof that a heroin deal was the purpose of the Joliet trip, had any reasonable likelihood of affecting the verdict here. *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). In the circumstances of this case, we think not. The district court allowed the evidence of Rodriguez's tip in only after determining that nothing would be said that would not be fully corroborated in the rest of the Government's evidence. While we are of the opinion that the challenged part of the testimony should not have been admitted, we also particularly note, and commend, the careful attention given by the district court to the matter of admissibility. The judge having presided at the hearing on the suppression motion was aware of the substance of the informant's statement and the nature of the Government's evidence against the defendants. With this knowledge, the court in its rulings restricted the evidence to that which was to be corroborated by other evidence. On the other hand, the court refused to allow the DEA agent to testify that Rodriguez had stated Mancillas would make an advance payment in El Paso because there was no indication that there would be adequate evidentiary corroboration of that fact. What the court did, in sum, was to compare the substance of the informant's statement to the entire evidence to be offered in the Government's case in chief.

---

**13.** We emphasize that this holding will not preclude giving the jury a sense of context, where that can be accomplished without repeating a definite charge of criminality by a declarant who cannot be cross-examined.

Although, as we have stated, the evidence should have been excluded, the existence of ample corroboration that the trip to Joliet was for the purpose of receiving a heroin shipment precludes, in our opinion, our finding a reasonable possibility of impact on the verdict. Mancillas flew to El Paso to meet with Aveytia; soon thereafter, Aveytia drove to Chicago carrying over five kilograms of heroin; apparently unconcerned for the safety of four kilograms in the trunk of his car, he nonetheless took a kilogram into his Joliet motel room, and promptly called Mancillas' residence; very soon thereafter, Mancillas and Lowry joined him there. Although it is circumstantial, this is strong evidence that the purpose of the trip was in fact to receive heroin, and we can perceive no real likelihood the jury would have concluded otherwise if the challenged part of the Rodriguez statement had been excluded.

For the reasons stated, the judgments of conviction are

AFFIRMED.