UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Daniel BINKLEY,
Defendant–Appellant.

No. 88–2525.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1989.

Decided June 5, 1990.*

As Amended June 12, 1990.

---

* Pursuant to Circuit Rule 40(f), this opinion was circulated among all active judges of this court because it conflicts with the Ninth Circuit's holding in *United States v. Martin,* 599 F.2d 880 (9th Cir.1979) and the Tenth Circuit's recent holding in *United States v. Baggett,* 890 F.2d 1095 (10th Cir.1989). A majority of the judges did not favor a rehearing *en banc.*

Before CUDAHY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

KANNE, Circuit Judge.

Defendant-appellant Charles Daniel Binkley appeals his conviction of one count of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846 and two counts of use of a telephone to facilitate the distribution of cocaine in violation of 21 U.S.C. § 843(b). He argues that there was insufficient evidence to convict him of these offenses, and that it was error for the district court to admit evidence of his personal drug use at trial. For the reasons discussed below, we affirm.

## I. Facts

In this case, both the defendant-appellant, Charles Daniel Binkley, and the government acknowledge the presence of a large conspiracy to distribute marijuana, involving witnesses Jay Robinson, Jerry Solomon, and several other people. Binkley, however, repeatedly and emphatically denies that he participated in this conspiracy. Although he admits to having purchased at least marijuana from the two co-conspirators mentioned above, he maintains that these purchases were for his own personal use, a defense called the "buyer-seller defense."

In 1982, Binkley purchased three-fourths of a pound of marijuana from Robinson. He claims that this marijuana was for his own personal use, and testified at trial that he had hidden this marijuana in his woodshed and that part of it was destroyed by mice. In March of 1983, defendant purchased four pounds of "shake" marijuana from Solomon. "Shake" is the leaves which are trimmed off marijuana buds when they are cleaned. Although it is largely unsmokeable, there usually is about one ounce of marijuana buds still left in every pound of shake. Binkley testified at trial that it was his intent to purchase this shake, which usually is not saleable, and to separate the buds from the leaves to obtain marijuana for his personal consumption.

Ralph M. Friederich, Asst. U.S. Atty., Office of the U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Bruce D. Stewart, Harrisburg, Ill., for defendant-appellant.

The government, on the other hand, claims that Binkley bought this shake from Solomon in order to resell it. On March 17, 1983, Binkley had a telephone conversation with Solomon in which he said that he "might have somethin' workin'" and might need to replace the four pounds of shake he previously purchased from Solomon. Binkley told Solomon he might need it by the next day but wouldn't know until the afternoon. Binkley told Solomon "I got one in the hay."

On March 18, 1983, Binkley called Solomon again. He said, "I need 'em." When asked when, he replied that he would need them somewhere around noon. The following dialogue then occurred:

Solomon: No problem.
Binkley: No problem? I looked at those others ...
Solomon: Uh-huh.
Binkley: And they've lost some, I guess because of the humidity or lack of.
Solomon: Don't worry about it.
Binkley: Okay? I mean ...
Solomon: I'll just bring you somethin' like [unintelligible] little extra.
Binkley: It's about three. Little ones.

. . . . .

Solomon: Alright, s- so you need five more.
Binkley: No. I need four and, four and, uh ...
Solomon: Four and whatever.
Binkley: Four and just a little bit.

In a subsequent conversation on March 23, 1983, Binkley told Solomon that he was trying to do something real soon. Solomon replied that he would hold on to them and "make sure they won't go anywhere if you can do any good." Binkley stated that it might be three or four days before he knew for sure. After several moments of conversing on non-drug-related topics, Binkley indicated that "this is kind of exciting." He also said "that I'll try to get this other thing worked out, 'cause I could use that." Solomon responded that so could he, because things had been kind of slow.

Solomon testified at trial that these phone conversations referred to "shake" marijuana and that it appeared that Binkley was trying to set up a marijuana deal. On the other hand, Binkley testified at trial that these conversations referred to Binkley's attempt to replace four pounds of shake Solomon had sold to him earlier that month, but which had turned out to be wet and moldy. Binkley claims that the second four pounds also turned out to be wet and moldy and that he later attempted to get his money back. He further testified that what he said to Solomon on March 17 was "I got one *and a* hay," meaning that he had the $150.00 he still owed to Solomon. The March 23, 1983, conversation, Binkley testified, referred to his acknowledgement that he was trying to obtain marijuana elsewhere.

On March 29, 1983, Solomon and Binkley again spoke on the telephone. The pertinent part of their conversation went as follows:

Binkley: Well, I'm in need.
Solomon: No kiddin'.
Binkley: No. Maybe, maybe you don't understand what I'm talkin' about.
Solomon: Oh, okay. You're in need of the, that other thing.
Binkley: Yeah.

Solomon then told Binkley that he had to see someone, probably on Thursday, and would get back with him. On March 31, 1983, Binkley and Solomon again spoke on the phone. Solomon told Binkley that he had him taken care of and Binkley said he'd be over about 6:30. Solomon testified at trial that these conversations concerned cocaine, although he did not specifically recall *the occasion.* Binkley, *on the other hand,* contends that these conversations had to do with his attempt to recover the $250.00 he already had paid to Solomon for the "shake" marijuana, both deliveries of which turned out to be wet and moldy and to smell like ammonia when dried. Binkley stated that he thought that Solomon had to find $250.00 to repay him, and claimed not to know that Solomon kept $10–20,000.00 in cash around his house, as Solomon had testified.

On June 2, 1983, the FBI executed a search warrant on Solomon's property and confiscated several marijuana plants. The next day, Binkley called Solomon, and Solomon warned Binkley about the raid and told him to stay away from him. At trial, Solomon testified he only warned those people who were involved in drug activities with him.

Binkley was charged in a three-count indictment with one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846 and with two counts of using an interstate facility, the telephone, to facilitate the distribution of cocaine in violation of 21 U.S.C. § 843(b). At trial, Solomon, Robinson and his brother testified about their knowledge of Binkley with regard to the marijuana conspiracy. They said that: (1) Binkley never was a partner in the conspiracy; (2) Binkley never met with the other members of the conspiracy to discuss growing marijuana or any other aspect of the conspiracy with them; (3) Binkley never shared any of the profits of the conspiracy; (4) Binkley never contributed labor of any type to the conspiracy; and (5) Binkley never contributed money, seed, fertilizer or anything else tangible to the conspiracy. The district court denied Binkley's motion *in limine* to exclude evidence of his personal use of marijuana and cocaine at trial. Binkley was convicted on all three counts. He appeals his conviction, arguing that there was insufficient evidence to convict him, and that the district court erred in admitting evidence of his drug use.

## II. Discussion

### A. *Sufficiency of the Evidence*

#### 1. *Conspiracy to Distribute Marijuana*

Binkley argues that there was insufficient evidence to convict him of conspiring to distribute marijuana in violation of 21 U.S.C. § 846. With respect to conspiracies of this type, we noted in *United States v. Whaley*, 830 F.2d 1469, 1472–73 (7th Cir. 1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988):

Appellate review of the sufficiency of the evidence to support a criminal conviction requires this court to determine whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'

. . . . .

This appellate court will not reconsider the evidence or assess the credibility of the witnesses.... We give deference to the trial jury's weighing of the evidence and its drawing of reasonable inferences.... 'Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' ... To succeed in his challenge of the sufficiency of the evidence, therefore, the appellant has a heavy burden....

(emphasis in original and citations omitted). For the reasons discussed below, we conclude that Binkley is unable to meet this burden.

#### a. *"Mere Purchase"*

▮ It is agreed that the purchase of drugs from a conspiracy, without more, does not rise to the level of membership in the conspiracy. *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988); *United States v. Douglas*, 818 F.2d 1317, 1321 (7th Cir.1987); *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). We think, however, that this is more than a case of "mere purchase." In *United States v. Marks*, 816 F.2d 1207, 1212 (7th Cir.1987), we noted that someone who buys from a conspirator for resale is a member of the conspiracy if he at least knows its general aims. The evidence introduced at trial established that Binkley knew the individuals involved in the conspiracy and the conspiracy's purpose; that is, he knew where to go to buy marijuana. We think, moreover, that the facts of this case establish that Binkley was buying marijuana for resale. As Solomon testified at trial, "shake" marijuana usually is not saleable, but one could separate about an

ounce of marijuana buds out of every pound of shake, and sell this marijuana at a profit over the price of the "shake." A rational jury could find that Binkley's telephone conversations with Solomon of March 17 and 18, 1983 showed that he purchased this marijuana for resale. *See Mancillas*, 580 F.2d at 1307. Thus, we believe that Binkley properly was found to be a member of the conspiracy despite the fact that he did not participate in each aspect thereof. *Cf. United States v. Herrera–Medina*, 853 F.2d 564, 565 (7th Cir. 1988) (defendant properly was found to be a member of the conspiracy despite the fact that no informant testified that he was a member). To the extent that Binkley's testimony conflicted with that of Solomon and others, this is a question of credibility (for determination by the jury) which we do not disturb on appeal. *Whaley*, 830 F.2d at 1472 & n. 3.

■ Binkley claims that there is no direct evidence that he joined the conspiracy. As the government points out, however, evidence that establishes a defendant's participation beyond a reasonable doubt, even if circumstantial, is sufficient to link that defendant to the conspiracy. *United States v. Zambrana*, 841 F.2d 1320, 1346 (7th Cir.1988). Here, a rational jury could infer from the testimony at trial and the telephone conversations that Binkley bought marijuana from Solomon with the intent to resell it. In short, we think that the jury properly rejected Binkley's buyer-seller defense.

b. *"Mere Presence"*

■ Binkley's second argument is that mere presence at the scene of the crime or mere association with the co-conspirators will not by itself support a conspiracy conviction. This is true. *See, e.g., Mancillas*, 580 F.2d at 1308. Presence or a single act will suffice, however, if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy. *Zambrana*, 841 F.2d at 1346 (quoting *United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682

(1983)). As we discussed above, a rational jury could find that Binkley's telephone conversations with Solomon show his intent to resell the marijuana he was purchasing, and thus advance the ends of the conspiracy. *Mancillas*, 580 F.2d at 1308.

2. *Unlawful Use of a Communication Facility*

■ Binkley next argues that there was insufficient evidence to convict him of a use of a communication facility to facilitate the distribution of cocaine in violation of 21 U.S.C. § 843. Binkley's first contention is that his tape-recorded conversations with Solomon on March 29 and 31, 1983, did not relate to cocaine. Binkley maintains that the only evidence that these conversations referred to cocaine was Solomon's testimony that his statement on March 29, 1983 "you're in need of that other thing" must have referred to cocaine because he sold only two types of drugs, marijuana and cocaine, and therefore "that other thing" was a reference to cocaine.

■ Binkley's version of these conversations is that they referred to his efforts to get $250.00 he had paid to Solomon for "shake" marijuana returned to him. He claims that Solomon had twice delivered four pounds of "shake" to him earlier in March, but each time they turned out to be wet and moldy, and to have an ammonia smell when dried. Binkley argues that Solomon's direct testimony that "that other thing" must have referred to cocaine was impeached by his grand jury testimony of July 27, 1987, wherein he was asked to name his "gram customers" for cocaine. In Solomon's response, he did not name Binkley. Likewise, when Solomon was asked during his grand jury testimony whether he ever had any drug dealings with Binkley, Solomon responded that he had sold Binkley some "shake" in the spring of 1983. Binkley also argues that Solomon could not have been referring to cocaine because tapes of other phone conversations Solomon and his fiancee had with Jay Robinson on March 25, March 29, March 31, and April 1, 1983 indicate that Solomon could not have had any cocaine to

sell to Binkley on March 31.[1] Finally, Solomon was testifying pursuant to a plea agreement, and thus would have had an incentive to lie about his dealings with Binkley.[2]

We disagree with Binkley that no rational jury could find from the March 29 and 31, 1983 conversations that Binkley was purchasing cocaine from Solomon. First, we believe that the jury properly could have inferred from the March 29 conversation that "that other thing" referred to cocaine. Binkley argues that no specific "code words" commonly known to refer to cocaine are used in these conversations. As this court noted in *United States v. Zanin,* 831 F.2d 740, 744 (7th Cir.1987), however, "conversations regarding drug transactions are rarely clear. A fact finder must always draw inferences from *veiled allusions and code words.*" (emphasis added); *see also United States v. Vega,* 860 F.2d 779, 795–96 ("jury was entitled to interpret terms like 'chickens,' 'roosters' and 'it' as referring to cocaine").

Likewise, the fact that there was an "innocent" explanation for the March 29 and 31 conversations, moreover, is, as we said in *Zanin,* "irrelevant." 831 F.2d at 745. Juries are free to choose between inculpatory and exculpatory interpretations of telephone conversations. *United States v. Diaz,* 876 F.2d 1344, 1355 (7th Cir.1989); *United States v. Nesbitt,* 852 F.2d 1502, 1511–12 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989) ("A jury exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt"); *Vega,* 860 F.2d at 796 ("A possible innocent explanation for Vega's conversations does not affect the validity of the jury's contrary conclusion"). Thus, we believe that the jury was entitled to conclude that Binkley's conversations with Solomon referred to cocaine.

Binkley next argues that even if these conversations did refer to cocaine, the government failed to sustain its burden of proof because he purchased this cocaine for personal use. Even assuming that this is true, we nonetheless find that Binkley violated 21 U.S.C. § 843(b).

Binkley urges us to adopt the interpretation placed upon § 843(b) by the Ninth Circuit in *United States v. Martin,* 599 F.2d 880, 888 (9th Cir.), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979). There, that court held that the purchase of cocaine for one's own use does not violate § 843(b). We agree with the other circuits that have interpreted § 843(b), however, that the term "facilitate" should be given its ordinary meaning, which is, simply, "to make easier." *United States v. McLeron,* 746 F.2d 1098, 1106 (6th Cir.1984); *United States v. Phillips,* 664 F.2d 971, 1032 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). In addition, it is not necessary to determine what a defendant does with the cocaine he pur-

---

1. In the March 25, 1983 conversation, Solomon agreed to supply Robinson with cocaine to take with him to a hockey game on Saturday, April 2, 1983. In a March 29, 1983 conversation between Robinson and Julie Sanford, Solomon's fiancee, Sanford advised Robinson that Solomon did *not* have any cocaine and would not have any until Friday, April 1, 1983. On March 31, 1983, Solomon spoke on the telephone with Robinson approximately two hours after he spoke with Binkley and informed him that he had him (Binkley) taken care of. In that conversation, Solomon and Robinson discussed growing marijuana but did not discuss the cocaine Solomon was supposed to obtain for Robinson. The April 1 conversation indicated that Solomon had just obtained the cocaine for Robinson and agreed to leave the cocaine on his back porch in a boot. On cross-examination, Solomon apparently conceded that these conversations could have meant that he did not have any cocaine to sell to Binkley on March 31, 1983. On the other hand, on re-direct examination, Solomon testified that he occasionally sold cocaine to people out of his personal supply, that if Robinson had wanted cocaine for Saturday he would not necessarily have wanted to pick it up on Thursday, and the fact that he had cocaine for Binkley does not necessarily mean that he would have had cocaine for Robinson because he would not have sold cocaine earmarked for one person to another.

2. Whether Solomon's plea agreement gave him incentive to lie in this case is a question of credibility for the jury to determine. *Whaley,* 830 F.2d at 1472 & n. 3.

chased in order to determine whether that defendant violated § 843(b). Section 843(b) states that it is "unlawful for any person knowingly or intentionally to use any communication facility ... in causing or facilitating the commission of ... a felony under any provision of [Title II of the Comprehensive Drug Abuse Prevention and Control Act]." Binkley's telephone conversations with Solomon not only made Solomon's sale of cocaine (a felony under Title II of the Act) easier, it made the sale possible. *See McLeron*, 746 F.2d at 1106 (§ 843(b) violated where defendant's use of telephone *facilitates* either his own or *another person's* possession or *distribution*) (emphasis added); *Phillips*, 664 F.2d at 1032 (same). Binkley's subsequent treatment of the cocaine cannot retroactively diminish Binkley's previous facilitation of Solomon's cocaine sale. Thus, we believe that the jury properly determined that Binkley's phone conversations with Solomon facilitated Solomon's sale of cocaine, regardless of what Binkley did with the cocaine after the sale.

### B. *Evidence of Prior Drug Use*

Binkley argues that the district court erred in denying his motion *in limine* to prevent the government from introducing evidence of his prior drug use at trial. We agree with the government, however, that the district court properly denied this motion.

Binkley essentially makes three arguments. First, he maintains that it was reversible error for the district judge to fail to specify the reasons for admission of this evidence on the record when he decided the motion *in limine*. Second, even assuming that the reasons for admission given by the district court in its limiting instruction to the jury cure this error, Binkley argues that this evidence is not admissible for the purposes for which the district court instructed the jury that it was admissible. Finally, even assuming that this evidence was probative for the reasons given by the district court in its limiting instruction, Binkley argues that the probative value of this evidence did not outweigh its preju-

dicial effect. We address these arguments in turn.

In *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir.1987), this court noted that when district judges exercise their discretion to admit Rule 404(b) evidence:

[T]here must be a principled exercise of discretion. The district judge must both identify the exception that applies to the evidence in question and evaluate whether the evidence, although relevant and within the exception, is sufficiently probative to make tolerable the risk that jurors will act on the basis of emotion or an inference via the blackening of the defendant's character. Discretion, when exercised, will rarely be disturbed.

 Both before and after *Beasley*, this court has urged trial courts in this circuit to make more explicit their rulings on admission of Rule 404(b) evidence, "so that on appeal we can more readily review the appropriateness of the trial court's findings." *United States v. Archer*, 843 F.2d 1019, 1024 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 100, 102 L.Ed.2d 76 (1988) *and cases cited therein*. Here, as in *Archer*, the district court could have made its decision on defendant's motion *in limine* more explicit. The trial court's discussion of the motion *in limine* on the record, however, indicates that it reviewed this motion "at some length" with the attorneys. *Id*. at 1024 (district court did not abuse its discretion in admitting evidence where both the magistrate and the district court held separate hearings on defendant's motion to exclude evidence under Rule 404(b), discussed the appropriate requirements of the rule, listened to arguments of both parties, and explained their findings to the parties); *compare Beasley*, 809 F.2d at 1273 (pretrial hearing characterized as "perfunctory").

Moreover, we think that the district court's instructions to the jury, limiting the purposes for which this evidence could be considered, cured the district court's failure to specify its reasons when it denied the motion *in limine*. *Cf. United States v. Hudson*, 843 F.2d 1062, 1067 (7th Cir.1988) (where district judge failed to engage in a

separate Rule 404(b) analysis, this meant that the district court abused its discretion when it admitted evidence pertaining to prior acts without a cautionary instruction to the jury that the evidence was not relevant to the guilt or innocence of one of the two defendants).

▮ Next, Binkley argues that even if it was clear from the district court's instruction that the evidence of Binkley's drug use was admitted only to show "knowledge, intent, opportunity, absence of mistake and identity," the evidence of Binkley's prior drug use was not in fact admissible for these purposes. We disagree. *See, e.g., Davis*, 838 F.2d at 914–15 (where defendant's defense at trial was that he made purchases of marijuana for his own personal use, evidence of defendant's cocaine purchasing and selling activities were admissible to prove knowledge and involvement with other conspirators); *United States v. Mateos–Sanchez*, 864 F.2d 232, 235 (1st Cir.1988) (district court properly allowed cross-examination on prior use of drugs on grounds that it was probative of, among other things, knowledge or absence of mistake or accident). Likewise, evidence of Binkley's prior use of cocaine with Solomon was admissible to prove his opportunity to purchase the cocaine from Solomon in the transaction at issue. Evidence of Binkley's prior use of cocaine was admissible, moreover, to prove the identity of the substance discussed in the March 29 and 31, 1983, phone calls, particularly if, as Binkley claims, this substance was cocaine, it was for his personal use.

▮ With respect to intent, Binkley argues that if evidence of use showed an intent to distribute, this court never would have approved the buyer-seller defense. This is not true. We think that in this case, evidence of Binkley's marijuana use was relevant to show that this purchase was *not* for his personal use. For instance, Scott Novak testified that he smoked marijuana with Binkley in the fall of 1983, and this marijuana was not shake marijuana.

▮ Finally, Binkley claims that the probative value of this evidence, if any, did not outweigh its prejudicial effect. We disagree. First, the district court properly instructed the jury that this evidence was admissible only for a limited purpose. *See, e.g., United States v. Shukitis*, 877 F.2d 1322, 1329 (7th Cir.1989); *Davis*, 838 F.2d at 915. Second, the fact that Binkley's defense was that the purchases alleged in the indictment were for his own personal use limits the prejudicial impact of this evidence as well. *Cf. Davis*, 838 F.2d at 916 n. 3 (challenge raised by defendant to district court's failure to give limiting instruction at the time defendant was questioned about other individuals smoking marijuana with him was "specious at best," because evidence that defendant's friends helped him smoke the marijuana he bought could only support his defense that he bought much of the marijuana for personal and social consumption).

## III. Conclusion

For the reasons discussed above, the conviction of Charles Daniel Binkley is AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I concur fully with the majority opinion except insofar as it sustains Binkley's conviction for use of a telephone to facilitate the distribution of cocaine in violation of 21 U.S.C. § 843(b). There is no evidence, as the majority agrees, that Binkley wanted to buy the cocaine involved here for any purpose other than for personal use.

The majority asserts, however, that Binkley, the potential consumer of the cocaine, has, by seeking the drug from Solomon, facilitated the distribution of the drug *from* Solomon *to* himself. This is an ingenious but ultimately unavailing rationale. It is a bit like saying that the victim of a statutory rape facilitated the crime by climbing into bed with the rapist. It is simply not possible, with respect to criminal responsibility, to participate in the *distribution* of drugs (or perhaps anything else) to one's self.

The governing statute defines the word, "distribution," in terms of "delivery." *See* 21 U.S.C. § 802(11). This means, at least by implication, that distribution can only be ultimately accomplished by "delivery" to a distributee. *See, e.g., United States v. Ramirez*, 608 F.2d 1261, 1264 (9th Cir.1979) (sharing of cocaine with others constitutes "distribution"; a small amount of cocaine is not a distributable amount); *United States v. Dovalina*, 525 F.2d 952, 957–58 (5th Cir.) (distinguishing between "possession"—defined as "possession for one's own use"—and "distribution"), *cert. denied by Soliz v. United States*, 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976).

Indeed, it is a well settled principle of criminal liability that a secondary party cannot be held accountable as an accomplice if the offense with which the principal is charged is defined in such a way that the secondary party's conduct is *inevitably incident* to its commission. See Model Penal Code § 2.06(6). (Most state codes contain this same provision.) In *People v. Hart*, for example, a Colorado Court of Appeals recently held that

> the conduct of one who takes delivery of [a] controlled substance is "inevitably incident" to the criminal conduct of one who delivers the controlled substance. Hence, a person who takes delivery of a controlled substance by purchase *is exempt from liability as a complicitor for the crime of distribution* committed by a person delivering the controlled substance to him.

787 P.2d 186, 189 (Colo.App.1989) (emphasis supplied). The existence of a distributee is inevitably incident to the crime of distribution. This means that a distributee can't logically be convicted of facilitating distribution to himself or herself. In *United States v. Pino–Perez*, 870 F.2d 1230, 1231 (7th Cir.1989) (en banc), *cert. denied*, —— U.S. ——, 110 S.Ct. 260, 107 L.Ed.2d 209 (1989), we said that, "When a 'crime is so defined that participation by another is necessary to its commission,' that other participant is not an aider and abettor," *quoting United States v. Southard*, 700 F.2d 1, 20 (1st Cir.1983). If Binkley cannot be convicted of "aiding" or "abetting" dis-

tribution to himself, it follows that he cannot be held accountable for "facilitating" distribution to himself either. Indeed, "aiding" and "facilitating" are almost synonymous.

Moreover, the majority's argument is untenable for another reason. Under 21 U.S.C. § 843(b), it is unlawful to use a telephone to facilitate any act constituting a felony under Title II. The majority argues that Binkley facilitated Solomon's sale of cocaine, a felony under § 841(a). But, in view of the arguments I have outlined, the focus should be on Binkley's acts, not on Solomon's. The indictment itself focuses on Binkley's actions—upon his telephoning Solomon to inquire about the availability of cocaine. As the Ninth Circuit has held:

> the use of a telephone to order cocaine for personal use is … not a lesser-included offense; indeed, it is no offense at all. Section 843(b) condemns the use of a telephone in facilitating the commission of certain felonies. Possession [of small amounts] of cocaine for personal use is only a misdemeanor. *See* 21 U.S.C. § 844. There is no statute analogous to § 843(b) punishing the use of the telephone to commit a misdemeanor.

*United States v. Brown*, 761 F.2d 1272, 1278 (9th Cir.1985). Hence, under the majority's theory, actual possession of one gram of cocaine would be a misdemeanor, though use of the telephone to obtain the cocaine would be a felony. This makes no sense.

Further, in *United States v. Martin*, 599 F.2d 880, 888 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979), the Ninth Circuit held that a person who merely attempts to purchase a drug for his own use cannot be convicted, on the basis of that act alone, of "facilitating" a conspiracy. Shortly after the opinion was approved, the Tenth Circuit in *United States v. Baggett*, 890 F.2d 1095 (10th Cir. 1990) joined the Ninth Circuit's decision in *Martin*. No other circuit has yet held otherwise. For circuits citing *Martin* with approval see *United States v. Van Buren*, 804 F.2d 888, 892 (6th Cir.1986); *United*

*States v. Prieskorn*, 658 F.2d 631, 634 (8th Cir.1981).

For these reasons, neither the facts nor the law here supports the conviction of Binkley on the telephone facilitation counts. I therefore respectfully dissent with respect to these counts.