06-1571-cr
United States v. Wexler

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2007

Docket No. 06-1571-cr

Argued:  October 31, 2007                                    Decided: April 3, 2008

_____

UNITED STATES OF AMERICA,

        Appellee,

    v.

DAVID E. WEXLER,

        Defendant-Appellant.

_____

Before:  MINER and RAGGI, Circuit Judges, and RAKOFF, District Judge.[*]

Appeal from a judgment of conviction and sentence entered in the United States District Court for the Southern District of New York (Preska, J.) convicting the appellant, after jury trial, on all counts of a seventeen-count indictment charging various offenses involving distribution of controlled substances and health care fraud related to appellant's medical practice, the District Court having, inter alia, (1) found that out of court statements inculpating appellant made by a now-deceased drug addict were admissible as statements against penal interest; (2) received expert testimony regarding the scope of the medical practice of dermatologists and declined to instruct the jury as to a "good intentions" component of the good faith defense applicable to a physician's distribution of controlled substances; (3) denied appellant's motion, grounded in the claim of lack of sufficient evidence, for acquittal on the charge that appellant was a co-conspirator in a controlled substance distribution that resulted in death.

Affirmed in part, reversed in part, and remanded for resentencing.

Judge Raggi dissents in part in a separate opinion.

_____

[*]    The Honorable Jed S. Rakoff, Judge of the United States District Court for the Southern District of New York, sitting by designation.

DIARMUID WHITE, White &
White, New York, New York,
for Defendant-Appellant.


JONATHAN KOLODNER, Assistant United
States Attorney, (Michael Garcia, United
States Attorney for the Southern
District of New York), New York, New
York for Appellee.

MINER, Circuit Judge:

Defendant-appellant David Wexler appeals from a judgment of conviction and sentence entered in the United States District Court for the Southern District of New York (Preska, J.) convicting Wexler, after a jury trial, of all seventeen counts of an indictment charging various offenses involving the distribution of controlled substances and health care fraud related to Wexler's medical practice. During the course of the proceedings, the District Court (1) found that out of court statements made by a now-deceased drug addict were admissible as statements against penal interest; (2) received expert testimony regarding the scope of the medical practice of dermatologists and declined to instruct the jury as to a "good intentions" component of the good faith defense applicable to a physician's distribution of controlled substances; and (3) denied Wexler's motion, grounded in the lack of sufficient evidence, for an acquittal on the charge that Wexler was a co-conspirator in a controlled substance distribution that resulted in death. On appeal, Wexler challenges each of these rulings. For the reasons that follow, we affirm the judgment of the District Court in part, reverse in part, and remand for resentencing.

**BACKGROUND**

I.    The Judgment of Conviction and Sentence

The judgment of conviction and sentence was entered on March 17, 2006. Wexler was convicted, after a 7-day jury trial, of: conspiracy to distribute, and possession with intent to distribute, Dilaudid, Percocet, Vicodin, and Xanax, in violation of 21 U.S.C. § 846, and conspiracy to distribute Dilaudid resulting in death, in violation of §§ 812 and 841(a)(1) and (b)(1)(C) ("Count One"); unlawful distribution and possession with intent to distribute Dilaudid, in violation of 21 U.S.C. §§ 812 and 841(a)(1) and (b)(1)(C) (Counts "Two," "Four," and "Eight"); unlawful distribution and possession with intent to distribute Dilaudid resulting in death in violation of 21 U.S.C. §§ 812 and 841(a)(1) and (b)(1)(C) ("Count Nine"); unlawful distribution and possession with intent to distribute Xanax, in violation of 21 U.S.C. §§ 812 and 841(a)(1) and (b)(2) ("Count Three"); unlawful distribution and possession with intent to

3

distribute Vicodin, in violation of 21 U.S.C. §§ 812 and 841(a)(1) and (b)(2) (Counts "Five" and "Six"); unlawful distribution and possession with intent to distribute Percocet, in violation of 21 U.S.C. §§ 812 and 841(a)(1) and (b)(2) ("Count Seven"); conspiracy to commit health care fraud and to make false statements on documents submitted to health care benefit plans and insurance companies, in violation of 18 U.S.C. § 371 (Counts "Ten" and "Twelve"); and health care fraud, in violation of 18 U.S.C. § 1347 (Counts "Eleven" and Thirteen through Seventeen). The jury also answered affirmatively that the narcotics conspiracy charged in Count One resulted in the death of Barry Abler, but the jury found that the substantive distribution of narcotics charged in Count Nine did not result in the death of Barry Abler. The District Court sentenced Wexler on March 16, 2006. The sentence included the following terms of imprisonment: twenty years on Counts One, Two, Four, Seven, Eight and Nine; three years on Count Three; five years on Counts Five, Six, Ten and Twelve; and ten years on Counts Eleven and Thirteen through Seventeen, all terms of imprisonment to run concurrently. The sentence also provided for terms of supervised release as follows: five years on Count One; three years on Counts Two Four, Seven, Eight, and Nine; and three years on Counts Three, Five, Six and Ten through Seventeen, all terms of supervised release to run concurrently. In addition, the judgment requires restitution to Medicare and various insurers in the total sum of $887,804.00 and imposes a mandatory special assessment of $1,700. Wexler currently is serving his sentence of imprisonment.

II.     The Case for the Government

The evidence at trial established that Wexler, a dermatologist in Manhattan, committed health care fraud by submitting false and inflated bills to insurance companies for medical procedures that he did not perform. Wexler prescribed to addicted patients numerous painkillers that were not medically necessary and he submitted fraudulent claims to those patients' insurance companies or providers. Wexler also provided numerous prescriptions for painkillers to Barry Abler, who resold some of the prescriptions. Abler later died of an overdose of Dilaudid.

The evidence at trial included: (i) the testimony of Steven Kravitz and Andrew Wist, two

4

of Wexler's patients who were introduced to Wexler by Abler, who were themselves addicts who receive prescriptions from Wexler that were not medically necessary and whose insurance companies were billed by Wexler for medical procedures that Wexler never performed; (ii) the testimony of Marty Laufer, who bought prescriptions from Abler that were written by Wexler, although Wexler never saw Laufer as a patient; (iii) the testimony of Janet Levine, who, unrelated to Abler, obtained unlawful prescriptions for various painkillers from Wexler and whose insurance companies were charged by Wexler for medical procedures that Wexler did not perform; and (iv) the testimony of Joseph Nash and Stanley Gerbin, both of whom were Wexler's patients whose insurance companies were charged for medical procedures that Wexler did not perform.

The government also called two expert witnesses — Dr. Robert Auerbach, a dermatologist who testified about the general standard of care provided by dermatologists and about certain procedures performed by dermatologists, and Dr. Michael Gelb, a dentist specializing in temporomandibular and orofacial pain disorders, regarding the management of pain, the addictiveness of certain medications, and the treatment of temporomandibular joint syndrome ("TMJ"). Dr. Auerbach also testified that the records maintained by Wexler were so incomplete that they were "not really medical charts" and, in regard to one particular patient, he testified that the records did not support the 1,200 skin excisions billed by Wexler because "[p]eople don't have that much skin to spare." The evidence also included the testimony of Investigator Richard Springer of the Drug Enforcement Administration, who interviewed Wexler on Several Occasions.

A.     Wexler's Criminal Conduct Involving Barry Abler

In 1992, Wexler began submitting bills to Medicare for treatments he purportedly performed on Barry Abler. As early as April 1992, Wexler submitted bills to Medicare for various dermatological procedures involving the benign excision of a piece of skin between three and four centimeters in length and one-and-a-half centimeters in width. At the same time,

5

Wexler wrote various prescriptions to Abler for certain painkillers, including Dilaudid, Percocet, and Vicodin, which are controlled substances, in addition to Carisprodol, commonly known as "Soma," which is not controlled. Abler allowed Wexler to fraudulently bill Medicare for various medical procedures that Wexler did not perform and Wexler, in turn, wrote prescriptions for any drugs Abler wanted.

From 1992 until Abler's death in May 2001, Wexler submitted false bills to Medicare for approximately 1,941 different skin excisions, for which Wexler received approximately $425,000. Abler, in turn, received hundreds of prescriptions for various painkillers, to which he was addicted. Abler complained to his friends that he suffered from TMJ, but there was no evidence that Wexler had examined or treated Abler for TMJ. Wexler also paid Abler between $700 and $750 monthly, and when Abler complained that this was not sufficient, Wexler offered to write prescriptions for Abler to sell on the street to make extra money.

Abler introduced Kravitz to Wexler. Abler told Kravitz, who became addicted to painkillers after suffering a broken leg, that he could get as many prescriptions for painkillers as he wished from Wexler. In 1995, Kraviz went to visit Wexler for the first time, at which time Wexler gave Kravitz a quick examination, although Wexler did not examine Kravitz's leg, and gave Kravitz prescriptions for Percocet and Valium.

After his first visit to Wexler in 1995, Kravitz received monthly prescriptions from Wexler through Abler, but Kravitz rarely visited Wexler himself. Kravitz purchased these prescriptions from Abler, paying in cash, meals, clothing, and other gifts. The prescriptions were in Kravitz's name and were written by Wexler for such drugs as Percocet, Vicodin, Valium, and Soma. Wexler submitted several thousand dollars of claims to Kravitz's insurance companies for procedures Wexler did not perform.

Abler also introduced Wist to Wexler. Wist became addicted to painkillers after a fall and subsequent back surgery. Wist met Abler in 1999 in a store near Abler's apartment. Abler offered to sell Vicodin to Wist and Wist accepted the offer. Thereafter Wist purchased three

6

prescriptions from Abler that were written by Wexler, although Wexler had never met Wist. Thirty days after buying his last prescription from Abler, Wist went to see Wexler. Wist identified himself as a friend of Abler and told Wexler about his back pain. Wexler wrote various prescriptions for Wexler without examining him. Wexler billed Wist's insurance company for approximately $4,000 for procedures Wexler did not perform.

Wexler also wrote prescriptions for Abler to sell to Laufer. Laufer bought Soma from Abler. Abler also obtained prescriptions from Wexler for Percocet in Laufer's name, which prescriptions Laufer agreed to fill and give to Abler.

B.       Wexler's Criminal Conduct Involving Others

Wexler also provided numerous prescriptions for controlled substances to Janet Levine, who was also addicted to painkillers. During her first visit, Levine asked Wexler for Percocet and on subsequent visits, Levine used various complaints, for which Wexler never examined Levine, as excuses to ask for more painkillers. Wexler billed Levine's insurance company for $16,000 for procedures he did not perform. Levine later sought treatment for her addiction and asked Wexler not to prescribe any more painkillers for her. She subsequently relapsed and asked Wexler to prescribe more painkillers, which he did.

Wexler also entered into an arrangement with Nash, who at the time of trial, was ninety-three years old. Nash and Wexler reached an agreement in which Wexler would submit bills to medicare for procedures he purportedly performed on Nash, and Nash was paid $450 per month. Wexler submitted claims for $432,285 for claimed procedures on Nash — primarily four-centimeter excisions of skin — for which Wexler received $273,623 from Medicare. Unbeknownst to Nash, Wexler also submitted claims for $289,475 to Medicare for claimed excisions on Nash's wife, Yetta, for which Wexler received $163,453.

C.       Abler's Death and the DEA Investigation

On or about May 19, 2001, Wexler provided Abler with what would be a final prescription for Dilaudid. On May 28, 2001, Abler died of an overdose of Dilaudid and Soma.

On June 18, 2002, Investigators Springer and Joseph Mendez interviewed Wexler, who stated that he treated Abler for acne but that he also began treating him for depression because he felt sorry for Abler. Wexler initially denied that Abler was receiving Medicare. When asked if prescribing Dilaudid for a patient who was addicted could cause an overdose, Wexler responded "[y]eah, I guess that's what happened."

On January 29, 2003, Springer and Mendez interviewed Wexler again, at which time Wexler stated that the procedures performed on Abler were for removal of benign tumors which were all over Abler's body. When asked why no one else had mentioned anything unusual about Abler's body, Wexler stated that Abler was a "very fast healer." Wexler then admitted that half of the bills he submitted for procedures for Abler were fraudulent, and he admitted that he gave Abler approximately $700 per month. When asked whether Wexler knew if Abler was taking all of the drugs prescribed to him or if he was selling them on the street, Wexler said he did not know what Abler did once he left Wexler's office. Wexler stated that he gave prescriptions in other people's names to Abler, but he later claimed that these people were his patients. Wexler conceded that he had not made entries in his charts for these individuals and he admitted that approximately 25% of the claims for Joseph Nash were fraudulent. Wexler wrote a statement similar to what he told the investigators.

III.    The Case for the Defense

Wexler's defense theory as to Counts One through Nine was that he may have been mistaken as to how he treated the government witnesses and Abler but that he was legitimately attempting to treat their medical problems. Wexler conceded that he had committed the fraud charged in Counts Ten through Seventeen.

Wexler also called Dr. Ravi Tikoo, a neurologist and psychiatrist who specialized in pain management. Tikoo testified that pain — including that from TMJ — could be treated with narcotics and that dermatologists were licensed to prescribe such medications. Tikoo testified that all doctors have patients who complain of pain and anxiety and that a dermatologist can treat

8

pain from whatever source. Tikoo testified that for each of the government witnesses, the controlled substances prescribed by Wexler could have been an appropriate medical treatment. On cross examination, Tikoo testified that Wexler's medical charts did not provide support for the purported treatment of his patients. Tikoo also testified that medicine is highly specialized and that specialists are better equipped to treat certain ailments.

On February 18, 2005, the jury convicted Wexler of all counts and found by special verdict that Abler's death was caused by the conspiracy to distribute Dilaudid as charged in Count One but not by the distribution of Dilaudid as charged in Count Nine.

**ANALYSIS**

I.     Of the Out of Court Statements

By motion in limine, the Government sought rulings allowing admission into evidence of statements made to witnesses Kravitz, Wist and Laufer by Barry Abler. By a letter in support of the motion, the Government outlined the testimony to be given as follows:

> Specifically, [the three witnesses] will testify, among other things, that (1) Abler told them that Wexler prescribed any controlled substances Abler asked for in whatever quantities he wanted; (2) for Abler's part, Abler allowed Wexler to submit claims to his health insurance company for medical procedures Wexler did not perform; (3) Abler stated that, in addition to the exorbitant amount of prescriptions he received, Wexler also gave Abler approximately $700 per month as a kickback and prescriptions for Abler to sell to others in exchange for his involvement in the scheme; and (4) Abler told them about the scheme in an effort to draw them into it, and to this end, Abler told them he could introduce them to Wexler and assist them in obtaining prescriptions from him.

The District Court ruled that the statements were made by Abler against his own penal interests and were admissible as such. In support of its ruling, the District Court found that the statements, made to "trusted friends," were of the "sort . . . where the declarant has no motive falsely to implicate himself or anyone else," and "were not made to law enforcement officials." The District Court observed that there was no reason to suspect that the portions of the statement implicating Wexler were any less reliable than those implicating Abler and that there was no attempt by Abler to shift the blame to Wexler. The District Court concluded its ruling, which it

applied to each statement, as follows:

> Accordingly, I find that the statement was a statement against penal interest and, thus, it is sufficiently reliable to warrant an inference that a reasonable man in Abler's position would not have made the statement unless he believed it to be true, and I find that the corroborating circumstances indicate the truthfulness and trustworthiness of the statement. Accordingly, it will be received as a firmly rooted exception to the hearsay rule because it has particularized guarantees of trustworthiness.

One type of statement "not excluded by the hearsay rule if the declarant is unavailable as a witness" is

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed. R. Evid. 804(b)(3).

It was this rule upon which the District Court relied in admitting the statements at issue. Wexler argues here, as he did in the District Court, that the criteria for admission have not been met. He contends principally that, while portions of the statements of Abler as related to Kravitz, Laufer, and Wist may have inculpated Wexler, other portions solely inculpated Wexler and portrayed him as much more blameworthy than Abler. We review the Trial Judge's evidentiary ruling only for abuse of discretion. See United States v. Taubman, 297 F.3d 161, 164 (2d Cir. 2002) (per curiam). Moreover, we are constrained to disregard any error that does not affect substantial rights. Fed. R. Crim P. 52(a). We perceive no abuse of discretion or error of any kind in the evidentiary rulings of the District Court.

We have determined that

> [t]o satisfy [the penal interest] exception [to the hearsay rule], the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and

10

(3) that corroborating circumstances clearly indicate the trustworthiness of the statement.

United States v. Katsougratis, 715 F.2d 769, 775 (2d Cir. 1983) (internal quotations and citations omitted). Satisfaction of the third element has been required in cases where the statement was offered to inculpate the accused, see, e.g., United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995), although the rule provides that corroborating circumstances clearly indicating trustworthiness are necessary only when the statement is offered to exculpate the accused, see Fed. R. Evid. 804(b)(3). The confusion arose during the period when statements against penal interest were thought to implicate Confrontation Clause jurisprudence and therefore required "particularized guarantees of trustworthiness," see, e.g., United States v. Mathews, 20 F.3d 538, 545 (2d Cir. 1994) (internal quotation marks omitted), or a showing that this hearsay exception was "firmly rooted," see, e.g., United States v. Bakhtiar, 994 F.2d 970, 977 (2d Cir. 1993).

Confrontation Clause jurisprudence was altered substantially when the Supreme Court decided Crawford v. Washington, 541 U.S. 36 (2004). Crawford announced that testimonial out of court statements were inadmissible unless the defendant had a prior opportunity to cross examine the unavailable declarant. Thus were barred out of court statements by unavailable declarants formerly permitted if "bear[ing] adequate indicia of reliability." See Ohio v. Roberts, 448 U.S. 56, 66 (1980) (internal quotation marks omitted). The Court recently has made it clear that the Confrontation Clause does not apply to non-testimonial statements. See Davis v. Washington, 547 U.S. 813, 823–26 (2006). Whatever the contours of the definition of "testimonial," see United States v. Feliz, 467 F.3d 227, 232–37 (2006) (holding autopsy reports admissible as non-testimonial business records), it seems clear to us that statements against penal interest of the type made by Abler do not fall within them. In any event, the findings of the District Court clearly support its conclusion that the requirements of the hearsay exception for statements against penal interest have been satisfied.

In the first place, Abler, the declarant, was unavailable as a witness because of his death. Second, Abler's admission of criminal activity so far tended to subject him to criminal liability

11

that a reasonable person would not have made the statements without believing them to be true. Abler had extensive discussions with Kravitz, Laufer, and Wist in which he told them of the prescriptions that he could and did obtain in any quantity he wished, of the claims submitted by Wexler for services Wexler did not render, and of the money and prescriptions Abler received for the use of his name in the health fraud scheme. These statements were indeed corroborated by the non-hearsay testimony of Wist, Laufer, and Kravitz, by the prescriptions they received from Wexler directly and through Abler, by the fraudulent billing records, and by the pharmacy and insurance records.

In connection with his claim of error in the admission of the statements, Wexler cites Williamson v. United States, 512 U.S. 594 (1994), to support his argument that, while Abler's statements may have been self-inculpatory, they were primarily inculpatory of Wexler and therefore inadmissible. According to Williamson, Rule 804(b)(3) does not allow admission of non-self-inculpatory statements even if they are made within a broader narrative that is generally self-inculpatory. Id. at 600–01. Williamson is inapposite. In that case, a co-defendant confessed to a police officer that he was involved in criminal activity and also gave details about Williamson's separate criminal activity. The confession implicated Williamson in joint criminality with the co-defendant as well as criminality in which Williamson acted alone. The co-defendant thus made discrete non self-inculpatory statements within a "broader narrative" that was only "generally self-inculpatory." Id. (emphasis supplied). The statements of the co-defendant that pertained to Williamson exclusively were therefore inadmissible as not self-inculpatory, as required by Rule 804(b)(3). Here, each statement made by Abler incriminated himself as well as Wexler, as found by the District Court after "an adequately particularized analysis." United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004) (finding no abuse of discretion in the district court's admission of statements by a co-conspirator describing criminal conduct that the co-conspirator and the defendant had engaged in together).

In addition, the record affords us an alternative ground on which we can readily affirm the

district court's evidentiary ruling. See United States v. Tropiano, 50 F.3d 157, 161 (2d Cir. 1995). Specifically, the challenged statements were clearly in furtherance of a conspiracy that included both the declarant and the defendant and, thus, were admissible under Fed. R. Evid. 801(d)(2)(E). The existence of the narcotics conspiracy and Wexler's knowing participation in it were established by reasonable inferences drawn from evidence demonstrating that the drug distribution scheme was integral to a closely related health care fraud perpetrated by Wexler, Wexler's own admissions to providing Abler with prescriptions in other persons' names, and the content of the statements themselves. See Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Padilla, 203 F.3d 156, 161 (2d Cir. 2000); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).

II.      Of Expert Testimony and Related Jury Instructions

         A. The Testimony of Dr. Auerbach

         Dr. Auerbach testified as an expert witness for the Government. With respect to the health care fraud charges, he opined that it was impossible for Wexler to have performed the vast number of excisions for which he billed Medicare and various health insurance companies. With respect to the controlled substance distribution charges, his testimony described the scope of medical care provided by those who engage in the practice of dermatology. When questioned as to whether treatments for TMJ, depression, anxiety, and lower back pain were "within the standard of care provided by dermatologists," Auerbach consistently answered "no."

         Testifying specifically about the treatment of TMJ, Auerbach stated: "It is not part of dermatology. Dermatology is skin, hair, nails. It is not joints." Treatment for anxiety disorder by a dermatologist, according to Auerbach, would "do the patient a disservice, but may be worse than [treatment for] TMJ." Auerbach testified that a dermatologist treating for depression would also do the patient a disservice "except this could get even more serious than TMJ or anxiety in that it would lead to a patient harming himself or maybe other people." He also opined that "[d]ermatologists don't treat low back pain."

13

Wexler here contends, consistent with the objections and arguments of counsel in the District Court, that it was error for the court to receive testimony regarding a dermatologist's standard of care because, "once licensed as a physician, nothing bars the physicians from treating any condition in his medical practice." In claiming that he was prejudiced by this testimony, Wexler therefore argues that the standard of care of a dermatologist is not relevant and that only the general standard of care of a physician should be considered. According to this argument, consideration of a general standard of care is relevant only to malpractice issues and the testimony misled the jury into concluding that Wexler was unlawfully prescribing controlled substances based solely on the fact that he treated patients for conditions outside of his specialized area of practice.

Expert testimony is admissible when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. It serves that purpose when it "shed[s] light on activities not within the common knowledge of the average juror." United States v. Duncan, 42 F.3d 97, 102 n.3 (2d Cir. 1994). The admission of expert testimony is committed to the broad discretion of the District Court and will not be disturbed on review unless found to be "manifestly erroneous." Id. at 101 (internal quotation marks omitted). The expert testimony of Dr. Auerbach regarding the standard of care implicated in the practice of dermatology was properly received by the District Court as relevant to the question of Wexler's good faith in prescribing the controlled substances that were the subject of the indictment.

The Supreme Court teaches "that registered physicians can be prosecuted under [21 U.S.C.] § 841 when their activities fall outside the usual course of professional practice." United States v. Moore, 423 U.S. 122, 124 (1975). While failure to comply with the standard of care applicable to a medical specialty does not alone provide a basis for concluding that a physician's activities fall outside the usual course of professional practice, it surely is relevant to that determination. Evidence of such failure to comply is relevant because it makes that conclusion more probable than it would have been without the evidence. See Fed. R. Evid. 401.

14

Accordingly, we stand with the Ninth Circuit in the following statement of the rule:

> We agree with [defendant's] observation that a violation of the standard of care alone is <u>insufficient</u> to support the criminal conviction of a licensed practitioner under § 841(a). But we do not agree that evidence of the governing standard of care is <u>irrelevant</u> or <u>prejudicial</u>. To the contrary, only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the "usual course of professional practice" that his actions become criminal.

United States v. Feingold, 454 F.3d 1001, 1007 (9th Cir. 2006) (emphasis in original) (quoting Moore, 423 U.S. at 124); see also United States v. Alerre, 430 F.3d 681, 691 (4th Cir. 2005) (holding that defendants were wrong in "asserting that, because standard-of-care evidence might show that a physician contravened the civil standard, it must categorically be excluded from a criminal proceeding").

A physician charged with the illegitimate distribution of controlled substances, and thus with deviating from the usual course of medical practice, may raise a good-faith defense to be disproved by the Government beyond a reasonable doubt. In connection with such a defense, a jury must be informed that the drug has been legally dispensed if the physician had a good faith belief, based on a standard of objective reasonableness, that his prescription "was for a legitimate medical purpose and in accord with the usual course of generally accepted medical practice." United States v. Vamos, 797 F.2d 1146, 1153 (2d Cir. 1986). Wexler challenges the jury instruction as to good faith, claiming that the instruction lacked a "good intentions" component.

B.     The Requested Jury Charge

The final jury charge included the following:

> [T]he Government must prove beyond a reasonable doubt that the defendant dispensed the drugs, or caused them to be dispensed, other than for a legitimate medical purpose, other than in good faith, and not in the usual course of medical practice.

> Good faith in this context means the honest exercise of best professional judgment as to a patient's medical needs. It means that the doctor acted in accord with what he should have reasonably believed to be proper medical practice.

At a pre-charge conference, counsel for Wexler requested that the District Court "use the language of good intentions" in connection with the foregoing instruction. Counsel argued as follows:

> I insist that you put [in] good intentions. It is part of it. If you have good intentions and you make a mistake in this case and you do so making a gross mistake giving thousands of Dilaudid, making a gross[] mistake in treating the patient by not having competence, and not having the specialty of a doctor who could treat it, that any argument to this really revolves around good intentions. . . . If you have good intentions, it doesn't matter if you made a mistake. It only matters if you didn't have good intentions.

The District Court ruled as follows:

> I believe the point that you argue is included in the definition of good faith as meaning the honest exercise of best professional judgment as to a patient's medical needs. If the practitioner exercises his best professional judgment honestly but simply is mistaken, then it does seem to me that he falls within the good-faith exception. I think that good intentions is too loosey goosey a formulation and will lead to juror confusion.

We review claims of error in jury instructions de novo. See United States v. Aima-Marshall, 336 F.3d 167, 170 (2d Cir. 2003). In our review, we look to "the instructions as a whole to see if the entire charge delivered a correct interpretation of the law," United States v. Bala, 236 F.3d 87, 94–95 (2d Cir. 2000) (citations omitted), and reverse only where such a reviews reveals prejudicial error, see Aima-Marshall, 336 F.3d at 170. A defendant is not entitled to prescribe the exact language of a jury instruction, and the "charge is sufficient if it adequately appr[ises] the jury of the crime and offense." United States v. Johnson, 994 F.2d 980, 988 (2d Cir. 1993) (internal quotations and citations omitted).

The District Court did not err in declining the "good intentions" instruction offered by Wexler. Reading the instructions as a whole, the court properly charged that the Government was required to prove that Wexler caused the drugs to be dispensed other than for a legitimate medical purpose, other than in good faith, and not in the usual course of medical practice. Wexler contends that the omission of the "good intentions" language proposed would allow his conviction for a gross mistake or malpractice. This is not so, because the instruction on good

faith as to the honest exercise of professional judgment and a reasonable belief as to proper medical practice would shield Wexler from criminal liability for any mistake, however gross. It is only when a physician acts outside the proper realm of medical practice to distribute controlled substances that he acts as a "drug pusher" rather than as a medical professional. Vamos, 797 F.2d at 1152 (quoting Moore, 423 U.S. at 138).

While courts have included "good intentions" as part of instructions on good faith, see e.g., Vamos, 797 F.2d at 1152; United States v. McIver, 470 F.3d 550, 556 n.9 (4th Cir. 2006), its inclusion was not required here because the necessary good faith definition given was full and adequate. In Vamos, we did not pass on whether good intentions was a required component of good faith. Indeed, the inclusion of a good-intentions component of good faith may very well contradict the objective standard of reasonableness required for a finding of good faith. In any event, we find that the instruction given by the District Court adequately summarized the law and apprised the jury of Wexler's defense without the inclusion of a "good intentions" element.

III. Of the Sufficiency of the Evidence to Sustain the Charge of Conspiracy to Distribute Dilaudid, Resulting in Death

On appeal, Wexler challenges for insufficiency of the evidence his conviction by special verdict of so much of Count I as charged him with conspiracy to distribute Dilaudid, resulting in death. The same challenge was made following trial in a motion for a judgment of acquittal, which was denied by the District Court in a written opinion. See United States v. Wexler, No. 03 CR 1150, 2005 WL 2848908 (S.D.N.Y. Oct. 31, 2005). Count One of the Indictment charged Wexler with conspiring with "others known and unknown to violate the narcotics laws of the United States." Specific to Wexler's insufficiency challenge is the following portion of Count One:

> 2. It was a part and an object of said conspiracy that DAVID E. WEXLER, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, to wit, Hydromorphone, commonly known as "Dilaudid," a Schedule II controlled substance, in violation of Sections 812, 841(a)(1) and 841(b)(1)(C) of Title 21, United States Code, which resulted in death.

17

As overt acts related to the foregoing, Count One charges that Wexler provided Abler with 120 Dilaudid pills on each of the following dates: September 23, 1999, March 10, 2000, April 10, 2001, and May 19, 2001. The remaining portions of Count One set forth as part and object of the conspiracy the distribution of Percocet, Vicodin and Xanax, all controlled substances, with overt acts describing distributions to various individuals on various dates.

We well recognize that one who challenges a verdict of conviction on the basis of evidentiary insufficiency bears a great burden, that the trial evidence is viewed most favorably for the Government, and that all reasonable inferences a jury may have drawn favoring the Government must be credited. See United States v. Bruno, 383 F.3d 65, 82 (2d Cir. 2004). We also recognize that we must sustain a jury verdict "if any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). In the application of this Rule to the conspiracy conviction challenged here, we note that "[i]n cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Morgan, 385 F.3d 196, 204 (2d Cir. 2004) (internal quotations and citations omitted). Finally, our sufficiency of the evidence test must consider the Government's case in its totality rather than in its parts, see United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999), and may be satisfied by circumstantial evidence alone, see United States v. Snow, 462 F.3d 55, 66 (2d Cir. 2006).

The foregoing rules, beneficial as they are to the Government, cannot substitute for the lack of sufficient evidence to support the conviction of Wexler in this case for conspiracy to distribute Dilaudid resulting in death. The substantive offense, charged in the part of Count Nine of which Wexler was acquitted, provides an enhanced penalty for the distribution of a Schedule II controlled substance such as Dilaudid under certain circumstances, i.e.: "if death or serious

18

bodily injury results from the use of such substance [the distributor] shall be sentenced to a term of imprisonment of not less than twenty years or more than life." 21 U.S.C. § 841(b)(1)(C). The conspiracy to commit the substantive offense charged in Count One (of which Wexler was convicted) bears the same penalty:

> [A]ny person who . . . conspires to commit any offense defined in this subchapter [the Controlled Substances Act] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy.

21 U.S.C. § 846.

In charging the jury in respect to both Counts One and Nine, the Court instructed:

> If you find the defendant guilty on Count 1 or Count 9, you will then be asked to determine whether death or serious bodily injury resulted from the use of the relevant controlled substance that the defendant distributed, possessed with intent to distribute, or conspired either to distribute or to possess with intent to distribute. This finding also must be made beyond a reasonable doubt. You need not find that the death or serious bodily injury from the use of the relevant controlled substance was reasonably foreseeable to the defendant.

(Emphasis supplied). The "relevant controlled substance" is, of course, the Dilaudid that Wexler provided to Abler by prescription on four occasions and that allegedly caused Abler's death. The question then is whether the evidence demonstrates that Wexler conspired with Abler to distribute Dilaudid as charged in Count One. Wexler does not here dispute that the ingestion of Dilaudid by Abler resulted in Abler's death.

"Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." Iannelli v. United States, 420 U.S. 770, 777 (1975). The conspirators must agree to commit an object crime, see United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977), here, the distribution of Dilaudid. The agreement may "be inferred from the facts and circumstances of the case." Iannelli, 420 U.S. at 778 n.10. Indeed, "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998). In this case, there is no direct or circumstantial evidence supporting Wexler's participation in a conspiracy to

19

distribute the drug Dilaudid as a part and object of the conspiracy charged in Count I.

Kravitz testified that Abler received Dilaudid, Soma, and Vicodin prescriptions from Wexler but answered "Vicodin and Soma" when asked if Abler ever told him "what drugs Wexler prescribed for the other people and the prescriptions that he gave to Barry Abler." Kravitz further testified that he received prescriptions "from Dr. Wexler through Barry Abler" for Percocet, Vicodin, Soma, Viagra, and Valium. Wist testified that he got prescriptions from Abler for Vicodin and later got prescriptions directly from Wexler for Vicodin, Soma, and Percocet. Laufer testified that he received prescriptions from Abler for Soma and Percocet. There is no evidence that the Dilaudid received by Abler from Wexler's prescriptions was redistributed or that there was ever any agreement or intention on the parts of Wexler and Abler to do so. Indeed, the quantities of Dilaudid that Abler received over the time periods that he received them were consistent with personal use. Abler, of course, was a heavy user of Dilaudid, and his use resulted in his death.

An agreement that one member of a conspiracy supply another with a drug — here by way of writing prescriptions — does not comprise an agreement to distribute that drug. Cf. United States v. Turner, 93 F.3d 276, 285–86 (7th Cir. 1996) (explaining that buyer-seller rule did not apply because it was shown that co-conspirator was "securing the possession of the contraband for later distribution" (citing United States v. Lechuga, 994 F.2d 346, 347 (7th Cir. 1993) (en banc))). Because there was no proof that Abler agreed to, or did, distribute Dilaudid, Wexler and Abler were mere buyer-and-seller with respect to Dilaudid. See United States v. Gore, 154 F.3d at 41 (holding that "the most basic element of the conspiracy charge" was not satisfied for failure "to show agreement to distribute drugs between [defendant] and another person"); cf. United States v. Medina, 944 F.2d 60, 65 (2d Cir. 1991) (buyer-seller rule did not apply where conspiracy was to buy drugs "for redistribution" and "in wholesale quantities . . . obviously not intended for personal use"). The illegal "sale" of Dilaudid (through prescription) by Wexler to Abler was a substantive crime, but "the sale agreement itself cannot be the

20

conspiracy [to distribute], for it has no separate criminal object." United States v. Thomas, 284 F.3d 746, 751–52 (7th Cir. 2002) (internal quotation marks omitted). The conspiracies to commit health care fraud and to distribute other controlled substances do not establish, and cannot take the place of, an agreement between Wexler and Abler to redistribute Dilaudid. The consideration for the "sale" was, of course, Abler's permission for Wexler to use his name in the health fraud scheme.

On appeal, the Government supports the finding of the District Court, contained in its Opinion and Order denying the motion for acquittal, that "the relationship between Defendant and Abler was part of a larger scheme involving narcotics distribution to facilitate health care fraud." Wexler, 2005 WL 2848908 at *3. The District Court examined the relationship between Abler and Wexler "in the context of a multi-year, multi-member conspiracy to distribute substantial, non-personal use quantities of a variety of drugs." Id. at *5. Relying on this over-arching conspiracy, the District Court determined that "[t]he limited buyer-seller rule does not apply to the instant facts and, therefore, cannot form the basis for acquittal." Id. at *3. The indictment, however, specifically alleges that the part and object of the conspiracy resulting in death was one to distribute Dilaudid, not a "variety of drugs." In light of this wording, the District Court's broad brush approach was inappropriate, as the only evidence that could bring Abler and Wexler out of the realm of buyer and seller with respect to Dilaudid was evidence suggesting an intent to redistribute Dilaudid itself. Yet, as described above, no such evidence was presented.

Moreover, the disparities in the sentences prescribed for the various drugs support the view that a conspiracy with the specific object of distributing Dilaudid was required to be proved. Cf. United States v. Thomas, 274 F.3d 655, 660 (2d Cir. 2001) (holding that "if the type and quantity of drugs involved in a charged crime may be used to impose a sentencing above the statutory maximum for an indeterminate quantity of drugs, then the type and quantity of drugs is an element of the offense that must be charged in the indictment and submitted to the jury"

21

(citing Apprendi v. New Jersey, 530 U.S. 446, 490 (2000))).[1] While Thomas concerned an indeterminate quantity of drugs, that case instructs that the principle of Apprendi applies equally here, where, under a theory that a general conspiracy to distribute drugs resulted in death, we would allow the enhanced penalty on the basis of indeterminate types of drugs. Where, as here, the type of drug is a critical determinant of the length of a defendant's sentence, the Government should be required to prove what it alleges.

**CONCLUSION**

A judgment of acquittal is warranted if the evidence is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. White, 673 F.2d 299, 301 (10th Cir. 1982). For the reasons heretofore given, we think that the lack of evidence here warrants a judgment of acquittal as to the charge of conspiracy to distribute the drug Dilaudid resulting in death. Accordingly, we reverse the judgment as to that conviction and affirm the judgment as to all other convictions.

Although the District Court imposed concurrent twenty year sentences of imprisonment on five substantive counts of distribution of a controlled substance concurrent with the conspiracies alleged in Count One, it might not have done so were it not constrained to apply the twenty-year minimum sentence on the portion of Count One charging a violation of 21 U.S.C. § 841(b)(1)(C), for which we have directed acquittal. The Sentencing Guidelines also are implicated by the acquittal. See U.S.S.G. § 2D1.1(a)(2). Accordingly, we remand for resentencing by the District Court in accordance with the foregoing without any suggestion as to what an appropriate sentence might be.

---

[1] In this connection, we note that Vicodin and Xanax, which Wexler was also charged with distributing and conspiring to distribute, are subject to statutory maximum sentences of five years, see 21 U.S.C. § 841(b)(1)(D), and three years, see 21 U.S.C. § 841(b)(2), respectively.

REENA RAGGI, *Circuit Judge,* concurring in part and dissenting in part.

The court today reverses a twenty-year mandatory minimum sentence imposed on David Wexler after a jury trial at which he was found to have distributed, as an object of a large-scale prescription drug conspiracy, a quantity of Dilaudid that caused the death of his co-conspirator Barry Abler.  See 21 U.S.C. §§ 841(b)(1)(C), 846.[1]  Relying on the buyer-seller rule, the majority concludes that the evidence was insufficient as a matter of law to permit any reasonable jury to find that Wexler participated "in a conspiracy to distribute the drug Dilaudid," because no evidence showed an agreement between Wexler and Abler for Abler to "redistribute[]" the Dilaudid that Wexler supplied.  Ante at **[20]**.  I respectfully dissent from this ruling because I think it rests on an unwarranted extension of the buyer-seller rule.  That rule precludes a jury from inferring the existence of a conspiracy from evidence showing nothing more than an arms-length drug sale.  Where a conspiracy has been otherwise proved, however, the rule does not authorize us to carve out of the jointly undertaken scheme drug transfers from one confederate to another because of a lack of proof of intent to redistribute.  Such a reading is without support in our precedent.  Further, even if the rule reached that far, I am not convinced that the evidence was insufficient as a matter of law to permit a reasonable jury to find a Dilaudid distribution conspiracy because the record, viewed in the light most favorable to the government, permits an inference both that Wexler and Abler had agreed that the latter might redistribute Dilaudid and that the men had agreed to effect distribution through unwitting third parties.

---

[1] The application of the statutory enhancement to Wexler is particularly apt because, as a licensed physician, he had more reason than the average street dealer to be aware of the potentially lethal effect of the drugs that he was illegally providing to numerous addicts, including Abler.

23

1.    The Buyer-Seller Rule

A transfer of drugs from a seller to a buyer necessarily involves agreement, however brief, on the distribution of a controlled substance from the former to the latter. Absent more, however, the law does not consider this momentary meeting of the minds sufficient to support a conviction for conspiring to distribute drugs. See United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998) ("Without more, [a] mere buyer-seller relationship . . . is insufficient to establish a conspiracy."); see also United States v. Thomas, 284 F.3d 746, 752 (7th Cir. 2002) (observing that "sale agreement" between buyer and seller "cannot be the conspiracy [to distribute], for it has no separate criminal object") (internal quotation marks omitted). In United States v. Medina, this court explained that "[t]he rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy." 944 F.2d 60, 65 (2d Cir. 1991). The Seventh Circuit has also endeavored to state a theoretical basis for the "buyer-seller rule":

> Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction. The relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy . . . . In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective.

United States v. Mancillas, 580 F.2d 1301, 1307 (7th Cir. 1978) (quoting United States v. Ford, 324 F.2d 950, 952 (7th Cir. 1963)).

Heretofore, this court has carefully "confined" application of the buyer-seller rule to circumstances "where the indictment charges or the proof shows no more than the sale transaction." United States v. Kahan, 572 F.2d 923, 935 (2d Cir. 1978) (emphasis added);

24

cf. United States v. Gore, 154 F.3d at 40.[2]  Thus, where the record has shown more than a simple arms-length drug sale, the rule has not legally foreclosed a finding of conspiracy. Rather, juries have decided from the totality of the evidence whether the prosecution has satisfactorily proved the existence of a distribution agreement going beyond the discrete sale from seller to buyer.[3]

In many cases, the "more" that will demonstrate such a larger agreement is evidence of the seller's knowledge that the buyer intends to redistribute the drugs in question.  See, e.g., United States v. Medina, 944 F.2d at 65 (recognizing that such knowledge and intent may be inferred from quantity of drugs).  But intended redistribution is not the only circumstance relevant to determining whether persons have a

---

[2] In United States v. Bommarito, this court also rejected the application of Wharton's Rule to drug conspiracies.  524 F.2d 140, 143 (2d Cir. 1975) (stating rule as follows: "'An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.' 1 Anderson, Wharton's Criminal Law and Procedure § 89, p. 191 (1957).").  The court cited the legislative history of 21 U.S.C. § 846 as "persuasive evidence . . . that a conspiracy to violate [federal drugs laws] should constitute a separate crime in addition to the substantive offense."  Id. at 144.

[3] Unlike defendants in many buyer-seller cases, Wexler never asked for a jury charge on the rule, did not argue the point in summation, and did not object to the trial court's failure to reference the rule in its conspiracy instruction.  See, e.g., United States v. Medina, 944 F.2d at 65-66 (discussing when buyer-seller instruction would be warranted).  This may be a function of his decision to challenge the government's case on its most basic level by arguing a failure to prove that his prescriptions were not bona fide.  Only after the jury resolved this issue against him did Wexler present the district court and this court with buyer-seller challenges never argued to the jury. These circumstances highlight why a high standard is set for a legal sufficiency challenge and why we will not reverse a jury verdict except upon a showing that no rational factfinder could have found guilt proved even on a view of the record evidence most favorable to the government.

25

"joint objective" that goes beyond a buyer's mere purpose to buy and a seller's mere purpose to sell. United States v. Mancillas, 580 F.2d at 1307. "[T]he length of time that the seller affiliated with the buyer, the established method of payment (for example, whether the seller 'fronted' the narcotics to the buyer), the extent to which the transactions were standardized, and the level of mutual trust between the buyer and the seller," United States v. Contreras, 249 F.3d 595, 599 (7th Cir. 2001), are all factors that a jury may properly consider in deciding whether the parties are involved in a larger distribution scheme such that even a single drug sale between them might be understood as "intended to advance the ends of [that larger] conspiracy," United States v. Mancillas, 580 F.2d at 1308.

2.    The Facts in this Case Do Not Support Application of the Buyer-Seller Rule

Applying these principles to this case, and viewing the evidence in the light most favorable to the government, I think we are compelled to conclude that a rational jury could find that Wexler and Abler's relationship was much more than that of a "mere" buyer and seller, United States v. Gore, 154 F.3d at 40, involved in a "casual sale of small quantities of drugs," United States v. Medina, 944 F.2d at 65, and that the multiple distributions of Dilaudid from Wexler to Abler were pursuant to a "contemporaneous understanding" on criminal objectives that reached far beyond any discrete cash-and-carry transaction for the particular pills that killed Abler, United States v. Mancillas, 580 F.2d at 1307.

The trial evidence convincingly demonstrated that Wexler's overarching criminal objective was to secure personal information from a number of individuals so that he could falsely bill their insurance providers for hundreds of thousands of dollars in fictional medical services. The evidence further showed that it was in furtherance of that

26

fraudulent purpose that Wexler assumed the role of a large-scale supplier of prescription drugs. In exchange for the personal information he needed to fuel his health care fraud scheme, Wexler supplied individuals with a wide variety of medically unnecessary drugs to which they were addicted. Barry Abler was one of these addicts. Over the course of almost ten years, from 1992 until Abler's death in 2001, Wexler regularly supplied Abler with a variety of controlled substances to which he was addicted, including Dilaudid, Vicodin, Percocet, and Xanax.

In the course of these dealings, Abler was no mere buyer involved in casual drug purchases from an independent seller. For more than a half dozen years, Abler was Wexler's co-conspirator in both the health care fraud scheme and its drug distribution subsidiary. Specifically, Abler introduced other addicts to Wexler as potential "patients" in the fraud scheme. Further, Abler frequently acted as a conduit between these persons and Wexler in the transfer of drugs or the scrip necessary to procure drugs. Precisely because Abler was a trusted co-conspirator in these twin criminal schemes, the record indicates that he did not pay Wexler for Dilaudid, or for any of the other drugs that he received, as would be expected in a mere buyer-seller relationship. To the contrary, it was Wexler who paid Abler with drugs and cash for his help in furthering the two conspiracies. To my mind, this evidence is enough, by itself, to take the case outside the buyer-seller rule. See generally United States v. Contreras, 249 F.3d at 599 (recognizing parties' lengthy relationship, non-cash payment for drugs, and high level of mutual trust as factors taking case outside buyer-seller rule). A conspirator who receives contraband in return for his assistance in a drug distribution scheme is "not a simple buyer of the commodity." United States v. Turner, 93 F.3d 276, 285 (7th Cir. 1996). As this court observed in United States v. Magnano, it is "only when there is no independent evidence

27

tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred that the single [sale] act is an insufficient predicate." 543 F.2d 431, 434-35 (2d Cir. 1976) (internal citation and quotation marks omitted). Plainly that is not this case.

3.     The Majority's Insistence on Proof of an Independent Dilaudid Conspiracy

The majority nevertheless holds that the buyer-seller rule applies in this case because Count One of the indictment does not charge the § 841(b)(1)(C) enhancement by reference to the overall drug distribution conspiracy but by reference only to the specific object to "distribute and possess with intent to distribute . . . 'Dilaudid.'" It construes this object pleading to require evidence proving Wexler's participation in a "conspiracy to distribute Dilaudid," ante at **[19, 20]**, and it concludes that "the only evidence that could bring Abler and Wexler out of the realm of buyer and seller with respect to Dilaudid was evidence suggesting an intent to redistribute Dilaudid," id. at **[21]**. I cannot agree with this analysis.

I do not read the object clauses of Count One of the indictment to allege multiple conspiracies, each aimed at the distribution of a particular drug. Rather, I read the indictment to charge a single, larger conspiracy "to violate the narcotics laws of the United States," Indictment ¶ 1, with multiple substantive objects, one of which was that "Wexler . . . and others known and unknown, would and did distribute . . . a controlled substance . . . commonly known as 'Dilaudid,'" which resulted in Abler's death, Id. ¶ 2. Both Wexler's participation in the charged larger conspiracy and his actual distribution of lethal Dilaudid to Abler are unchallenged on this appeal. Thus, whatever application the buyer-seller rule might have to determining the sufficiency of the evidence to prove a hypothetical conspiracy between Wexler and Abler to distribute only Dilaudid, I think the

28

rule has no bearing on the question actually before us: whether a rational jury could find that Wexler's distribution of Dilaudid to Abler was an object of the larger conspiracy proved. See United States v. Magnano, 543 F.2d at 434-35 (recognizing single drug sale as sufficient predicate where independent evidence proves defendant's knowledge of broader conspiracy).

In ruling otherwise, the majority cites United States v. Thomas, 274 F.3d 655 (2d Cir. 2001) (en banc), to support the conclusion that the government was obliged to prove a Dilaudid distribution conspiracy separate and distinct from the larger conspiracy charged in the indictment. But Thomas holds that "if the type and quantity of drugs involved in a charged crime may be used to impose a sentence above the statutory maximum for an indeterminate quantity of drugs, then the type and quantity of drugs is an element of the offense that must be charged in the indictment and submitted to the jury." Id. at 660 (footnote omitted). In this case, the defendant plainly does not challenge the type of drug that killed Abler or the quantity of the lethal dose. The only disputed fact is whether the distribution of the Dilaudid that killed Abler was an object of the larger charged conspiracy. For reasons already discussed, I think evidence of a long-standing agreement for Wexler to supply Abler with Dilaudid and other drugs as payment for his assistance in the larger distribution scheme was sufficient to support such a finding. Nothing in Thomas or the buyer-seller rule supports our carving out of an established drug distribution conspiracy those drug transfers from one conspirator to another made as payment for services to the larger scheme. See generally United States v. Turner, 93 F.3d at 285 (observing that "consideration . . . tendered for the receipt of the drugs was not a consideration unrelated to the conspiracy such as currency or even services unrelated to the conspiracy"). Nor do they warrant a legal conclusion that such transfers cannot be

29

objects of the larger conspiracy absent proof of the conspirators' intent to redistribute.

Even if I were to agree with the majority on this last point, however, I would still dissent because I think that the totality of the circumstances, viewed in the light most favorable to the government, would have permitted a rational jury to find a conspiratorial intent to redistribute Dilaudid. Steven Kravitz, an addict whom Abler introduced to Wexler to further both the health care fraud and drug distribution conspiracies, testified that Abler told him Wexler had offered to write as many prescriptions as Abler wanted precisely so that Abler "could make extra money selling the prescriptions." Trial Tr. at 220-21. Another addict, Marty Laufer, similarly testified that Wexler paid Abler by giving him $700 per month and prescriptions for personal use and sale. See id. at 858-59. This testimony, viewed together with documentary evidence of voluminous drug transfers from Wexler to Abler, supported a jury inference that, when Wexler supplied Abler with scrip, he did so with full knowledge and intent that Abler could use or sell the drugs thus secured as he wished. Nothing in the record indicated any intent by either man to exclude Dilaudid scrip from this general understanding. Although no addict testified to the actual receipt of Dilaudid from Wexler or Abler, the law is well established that a drug conspiracy requires proof only of the parties' mutual agreement, not the consummation of any particular object. See generally United States v. Jackson, 335 F.3d 170, 182 (2d Cir. 2003) ("As in all conspiracy cases, the essence of the crime is what the conspirators agreed to do, rather than what they actually did."). From evidence of Abler's seemingly limitless access to scrip from Wexler and his manipulation of such scrip over many years, whether in his own name or that of others, the jury could reasonably have concluded both that Abler was as ready to distribute Dilaudid for the right price as any other drug

supplied to him and that Wexler supplied Dilaudid scrip with that understanding.[4]

Finally, even if we were dealing here only with Dilaudid transfers between Wexler and Abler unrelated to any larger conspiracy, I think a rational jury could find an independent conspiracy to distribute Dilaudid. The record plainly demonstrates that the two men never contemplated effecting these transfers by themselves. Rather, the attainment of their Dilaudid distribution objective required concerted action to deceive essential, albeit unwitting, third parties, namely, the licensed pharmacists who would actually distribute Dilaudid pills to Abler. Pursuant to this agreement, Wexler would write fraudulent prescriptions that Abler would present to pharmacists fraudulently to induce them to dispense Dilaudid. This evidence was sufficient to support a jury finding that Wexler and Abler had entered into a conspiracy to secure the unlawful distribution of Dilaudid regardless of whether or not they intended to redistribute the drugs. See generally United States v. Bommarito, 525 F.2d at 144 (noting that involvement of third party defeats Wharton's Rule).

4. Conclusion

To summarize, because (1) the government's proof of Wexler's and Abler's involvement in the large-scale drug distribution conspiracy charged in Count One is essentially undisputed, the concern animating the buyer-seller rule — that a jury would

---

[4] The majority assigns significance to Kravitz's failure to include Dilaudid among the drugs Wexler prescribed for others. See ante at [20]. Given that Kravitz also failed to name Percocet as one of the drugs so prescribed, while Laufer testified that Wexler prescribed Percocet for him, a reasonable jury might well have concluded that Kravitz's knowledge of Wexler's drug distribution scheme was incomplete. Such a conclusion would hardly foreclose a jury determination that the evidence, as a whole, supported an inference of an understanding between Wexler and Abler that Abler could redistribute any drugs supplied to him by Wexler.

impermissibly infer conspiracy from a simple drug sale — is not present in this case. Further, because (2) sufficient evidence was adduced to permit a rational jury to find that Wexler routinely transferred Dilaudid and other drugs to Abler not pursuant to arms-length sales, but as payment for Abler's role in the larger drug and health care fraud conspiracies, I think the buyer-seller rule has no application to the facts of this case. Certainly, I do not think the rule authorizes us to carve the men's Dilaudid transfer agreement out of the larger distribution conspiracy to which it is linked or to conclude, as a matter of law, that such a transfer agreement cannot be an object of the larger conspiracy absent proof of a further intent to redistribute. Even if I were wrong in that respect, because (3) the evidence, viewed in the light most favorable to the government, would permit a rational jury to find a tacit agreement between Wexler and Abler that the latter could redistribute any drugs supplied by the former — including Dilaudid — it was necessarily sufficient, even under the majority's expansive construction of the buyer-seller rule, to prove an independent Dilaudid distribution conspiracy. The same conclusion follows from (4) trial evidence that Wexler and Abler engaged in concerted action to have their Dilaudid distribution objective effected by unwitting third-party pharmacists.

For these reasons, I would affirm the challenged twenty-year sentence. I join the majority in affirming Wexler's conviction in all other respects.